## ILLINOIS *v.* ALLEN

No. 606.   Argued February 24, 1970—Decided March 31, 1970

*Joel M. Flaum,* Assistant Attorney General of Illinois, argued the cause for petitioner. With him on the briefs were *William J. Scott,* Attorney General, and *James R. Thompson, Morton E. Friedman,* and *Thomas J. Immel,* Assistant Attorneys General.

*H. Reed Harris* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." We have held that the Fourteenth Amendment makes the guarantees of this clause obligatory upon the States. *Pointer* v. *Texas,* 380 U. S. 400 (1965). One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial. *Lewis* v. *United States,* 146 U. S. 370 (1892). The question presented in this case is whether an accused can claim the benefit of this constitutional right to remain in the courtroom while at the same time he engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial.

The issue arose in the following way. The respondent, Allen, was convicted by an Illinois jury of armed robbery and was sentenced to serve 10 to 30 years in the Illinois State Penitentiary. The evidence against him showed

that on August 12, 1956, he entered a tavern in Illinois and, after ordering a drink, took $200 from the bartender at gunpoint. The Supreme Court of Illinois affirmed his conviction, *People* v. *Allen,* 37 Ill. 2d 167, 226 N. E. 2d 1 (1967), and this Court denied certiorari. 389 U. S. 907 (1967). Later Allen filed a petition for a writ of habeas corpus in federal court alleging that he had been wrongfully deprived by the Illinois trial judge of his constitutional right to remain present throughout his trial. Finding no constitutional violation, the District Court declined to issue the writ. The Court of Appeals reversed, 413 F. 2d 232 (1969), Judge Hastings dissenting.

The facts surrounding Allen's expulsion from the courtroom are set out in the Court of Appeals' opinion sustaining Allen's contention:

> "After his indictment and during the pretrial stage, the petitioner [Allen] refused court-appointed counsel and indicated to the trial court on several occasions that he wished to conduct his own defense. After considerable argument by the petitioner, the trial judge told him, 'I'll let you be your own lawyer, but I'll ask Mr. Kelly [court-appointed counsel] [to] sit in and protect the record for you, insofar as possible.'

> "The trial began on September 9, 1957. After the State's Attorney had accepted the first four jurors following their voir dire examination, the petitioner began examining the first juror and continued at great length. Finally, the trial judge interrupted the petitioner, requesting him to confine his questions solely to matters relating to the prospective juror's qualifications. At that point, the petitioner started to argue with the judge in a most abusive and disrespectful manner. At last, and seemingly in desperation, the judge asked appointed

counsel to proceed with the examination of the jurors. The petitioner continued to talk, proclaiming that the appointed attorney was not going to act as his lawyer. He terminated his remarks by saying, 'When I go out for lunchtime, you're [the judge] going to be a corpse here.' At that point he tore the file which his attorney had and threw the papers on the floor. The trial judge thereupon stated to the petitioner, 'One more outbreak of that sort and I'll remove you from the courtroom.' This warning had no effect on the petitioner. He continued to talk back to the judge, saying, 'There's not going to be no trial, either. I'm going to sit here and you're going to talk and you can bring your shackles out and straight jacket and put them on me and tape my mouth, but it will do no good because there's not going to be no trial.' After more abusive remarks by the petitioner, the trial judge ordered the trial to proceed in the petitioner's absence. The petitioner was removed from the courtroom. The voir dire examination then continued and the jury was selected in the absence of the petitioner.

"After a noon recess and before the jury was brought into the courtroom, the petitioner, appearing before the judge, complained about the fairness of the trial and his appointed attorney. He also said he wanted to be present in the court during his trial. In reply, the judge said that the petitioner would be permitted to remain in the courtroom if he 'behaved [himself] and [did] not interfere with the introduction of the case.' The jury was brought in and seated. Counsel for the petitioner then moved to exclude the witnesses from the courtroom. The [petitioner] protested this effort

on the part of his attorney, saying: 'There is going to be no proceeding. I'm going to start talking and I'm going to keep on talking all through the trial. There's not going to be no trial like this. I want my sister and my friends here in court to testify for me.' The trial judge thereupon ordered the petitioner removed from the courtroom." 413 F. 2d, at 233–234.

After this second removal, Allen remained out of the courtroom during the presentation of the State's case-in-chief, except that he was brought in on several occasions for purposes of identification. During one of these latter appearances, Allen responded to one of the judge's questions with vile and abusive language. After the prosecution's case had been presented, the trial judge reiterated his promise to Allen that he could return to the courtroom whenever he agreed to conduct himself properly. Allen gave some assurances of proper conduct and was permitted to be present through the remainder of the trial, principally his defense, which was conducted by his appointed counsel.

The Court of Appeals went on to hold that the Supreme Court of Illinois was wrong in ruling that Allen had by his conduct relinquished his constitutional right to be present, declaring that:

"No conditions may be imposed on the absolute right of a criminal defendant to be present at all stages of the proceeding. The insistence of a defendant that he exercise this right under unreasonable conditions does not amount to a waiver. Such conditions, if insisted upon, should and must be dealt with in a manner that does not compel the relinquishment of his right.

"In light of the decision in Hopt v. Utah, 110 U. S. 574 . . . (1884) and Shields v. United States, 273

U. S. 583 . . . (1927), as well as the constitutional mandate of the sixth amendment, we are of the view that the defendant should not have been excluded from the courtroom during his trial despite his disruptive and disrespectful conduct. The proper course for the trial judge was to have restrained the defendant by whatever means necessary, even if those means included his being shackled and gagged." 413 F. 2d, at 235.

The Court of Appeals felt that the defendant's Sixth Amendment right to be present at his own trial was so "absolute" that, no matter how unruly or disruptive the defendant's conduct might be, he could never be held to have lost that right so long as he continued to insist upon it, as Allen clearly did. Therefore the Court of Appeals concluded that a trial judge could never expel a defendant from his own trial and that the judge's ultimate remedy when faced with an obstreperous defendant like Allen who determines to make his trial impossible is to bind and gag him.[1] We cannot agree that the Sixth Amendment, the cases upon which the Court of Appeals relied, or any other cases of this Court so handicap a trial judge in conducting a criminal trial. The broad dicta in *Hopt* v. *Utah, supra,* and *Lewis* v. *United States,* 146 U. S. 370 (1892), that a trial can never continue in the defendant's absence have been expressly rejected. *Diaz* v. *United States,* 223 U. S. 442 (1912). We accept instead the statement of Mr. Justice Cardozo who, speaking for the Court in *Snyder* v. *Massachusetts,* 291 U. S. 97, 106 (1934), said: "No doubt the privilege [of personally confronting witnesses] may be lost by

---

[1] In a footnote the Court of Appeals also referred to the trial judge's contempt power. This subject is discussed in Part II of this opinion. *Infra,* at 344–345.

consent or at times even by misconduct." [2]  Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938), we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. [3]  Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstrep-

---

[2] Rule 43 of the Federal Rules of Criminal Procedure provides that "[i]n prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict."

[3] See Murray, The Power to Expel a Criminal Defendant From His Own Trial: A Comparative View, 36 U. Colo. L. Rev. 171–175 (1964); Goldin, Presence of the Defendant at Rendition of the Verdict in Felony Cases, 16 Col. L. Rev. 18–31 (1916).

erous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

## I

Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint. It is in part because of these inherent disadvantages and limitations in this method of dealing with disorderly defendants that we decline to hold with the Court of Appeals that a defendant cannot under any possible circumstances be deprived of his right to be present at trial. However, in some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here.

## II

In a footnote the Court of Appeals suggested the possible availability of contempt of court as a remedy to make Allen behave in his robbery trial, and it is true

that citing or threatening to cite a contumacious defendant for criminal contempt might in itself be sufficient to make a defendant stop interrupting a trial. If so, the problem would be solved easily, and the defendant could remain in the courtroom. Of course, if the defendant is determined to prevent *any* trial, then a court in attempting to try the defendant for contempt is still confronted with the identical dilemma that the Illinois court faced in this case. And criminal contempt has obvious limitations as a sanction when the defendant is charged with a crime so serious that a very severe sentence such as death or life imprisonment is likely to be imposed. In such a case the defendant might not be affected by a mere contempt sentence when he ultimately faces a far more serious sanction. Nevertheless, the contempt remedy should be borne in mind by a judge in the circumstances of this case.

Another aspect of the contempt remedy is the judge's power, when exercised consistently with state and federal law, to imprison an unruly defendant such as Allen for civil contempt and discontinue the trial until such time as the defendant promises to behave himself. This procedure is consistent with the defendant's right to be present at trial, and yet it avoids the serious shortcomings of the use of shackles and gags. It must be recognized, however, that a defendant might conceivably, as a matter of calculated strategy, elect to spend a prolonged period in confinement for contempt in the hope that adverse witnesses might be unavailable after a lapse of time. A court must guard against allowing a defendant to profit from his own wrong in this way.

## III

The trial court in this case decided under the circumstances to remove the defendant from the courtroom and to continue his trial in his absence until and

unless he promised to conduct himself in a manner befitting an American courtroom. As we said earlier, we find nothing unconstitutional about this procedure. Allen's behavior was clearly of such an extreme and aggravated nature as to justify either his removal from the courtroom or his total physical restraint. Prior to his removal he was repeatedly warned by the trial judge that he would be removed from the courtroom if he persisted in his unruly conduct, and, as Judge Hastings observed in his dissenting opinion, the record demonstrates that Allen would not have been at all dissuaded by the trial judge's use of his criminal contempt powers. Allen was constantly informed that he could return to the trial when he would agree to conduct himself in an orderly manner. Under these circumstances we hold that Allen lost his right guaranteed by the Sixth and Fourteenth Amendments to be present throughout his trial.

## IV

It is not pleasant to hold that the respondent Allen was properly banished from the court for a part of his own trial. But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes. As guardians of the public welfare, our state and federal judicial systems strive to administer equal justice to the rich and the poor, the good and the bad, the native and foreign born of every race, nationality, and religion. Being manned by humans, the courts are not perfect and are bound to make some errors. But, if our courts are to remain what

the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case. The record shows that the Illinois judge at all times conducted himself with that dignity, decorum, and patience that befit a judge. Even in holding that the trial judge had erred, the Court of Appeals praised his "commendable patience under severe provocation."

We do not hold that removing this defendant from his own trial was the only way the Illinois judge could have constitutionally solved the problem he had. We do hold, however, that there is nothing whatever in this record to show that the judge did not act completely within his discretion. Deplorable as it is to remove a man from his own trial, even for a short time, we hold that the judge did not commit legal error in doing what he did.

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Brennan, concurring.

The safeguards that the Constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace. History has known the breakdown of lawful penal authority—the feud, the vendetta, and the terror of penalties meted out by mobs or roving bands of vigilantes. It has known, too, the perversion of that authority. In some societies the penal arm of the state has reached individual men through secret denunciation followed by summary punishment. In others the solemn power of condemnation has been confided to the caprice

of tyrants. Down the corridors of history have echoed the cries of innocent men convicted by other irrational or arbitrary procedures. These are some of the alternatives history offers to the procedure adopted by our Constitution. The right of a defendant to trial—to trial by jury—has long been cherished by our people as a vital restraint on the penal authority of government. And it has never been doubted that under our constitutional traditions trial in accordance with the Constitution is the proper mode by which government exercises that authority.

Lincoln said this Nation was "conceived in liberty and dedicated to the proposition that all men are created equal." The Founders' dream of a society where all men are free and equal has not been easy to realize. The degree of liberty and equality that exists today has been the product of unceasing struggle and sacrifice. Much remains to be done—so much that the very institutions of our society have come under challenge. Hence, today, as in Lincoln's time, a man may ask "whether [this] nation or any nation so conceived and so dedicated can long endure." It cannot endure if the Nation falls short on the guarantees of liberty, justice, and equality embodied in our founding documents. But it also cannot endure if we allow our precious heritage of ordered liberty to be ripped apart amid the sound and fury of our time. It cannot endure if in individual cases the claims of social peace and order on the one side and of personal liberty on the other cannot be mutually resolved in the forum designated by the Constitution. If that resolution cannot be reached by judicial trial in a court of law, it will be reached elsewhere and by other means, and there will be grave danger that liberty, equality, and the order essential to both will be lost.

The constitutional right of an accused to be present at his trial must be considered in this context. Thus

there can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward. Over a half century ago this Court in *Diaz* v. *United States,* 223 U. S. 442, 457–458 (1912), approved what I believe is the governing principle. We there quoted from *Falk* v. *United States,* 15 App. D. C. 446 (1899), the case of an accused who appeared at his trial but fled the jurisdiction before it was completed. The court proceeded in his absence, and a verdict of guilty was returned. In affirming the conviction over the accused's objection that he could not be convicted in his absence, the Court of Appeals for the District of Columbia said:

> "It does not seem to us to be consonant with the dictates of common sense that an accused person . . . should be at liberty, whenever he pleased, . . . to break up a trial already commenced. The practical result of such a proposition, if allowed to be law, would be to prevent any trial whatever until the accused person himself should be pleased to permit it. . . . This would be a travesty of justice which could not be tolerated . . . . [W]e do not think that any rule of law or constitutional principle leads us to any conclusion that would be so disastrous as well to the administration of justice as to the true interests of civil liberty.

> "The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries and turn them into a solemn farce, and ultimately compel society, for its own

safety, to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong."

To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes.

Of course, no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior. The record makes clear that respondent was so informed and warned in this case. Thus there can be no doubt that respondent, by persisting in his reprehensible conduct, surrendered his right to be present at the trial.

As the Court points out, several remedies are available to the judge faced with a defendant bent on disrupting his trial. He can have him bound, shackled, and gagged; he can hold him in civil or criminal contempt; he can exclude him from the trial and carry on in his absence. No doubt other methods can be devised. I join the Court's opinion and agree that the Constitution does not require or prohibit the adoption of any of these courses. The constitutional right to be present can be surrendered if it is abused for the purpose of frustrating the trial. Due process does not require the presence of the defendant if his presence means that there will be no orderly process at all. However, I also agree with the Court that these three methods are not equally acceptable. In particular, shackling and gagging a defendant is surely the least acceptable of them. It offends not only judicial dignity and decorum, but also that

respect for the individual which is the lifeblood of the law.

I would add only that when a defendant is excluded from his trial, the court should make reasonable efforts to enable him to communicate with his attorney and, if possible, to keep apprised of the progress of his trial. Once the court has removed the contumacious defendant, it is not weakness to mitigate the disadvantages of his expulsion as far as technologically possible in the circumstances.

MR. JUSTICE DOUGLAS.

I agree with the Court that a criminal trial, in the constitutional sense, cannot take place where the court-room is a bedlam and either the accused or the judge is hurling epithets at the other. A courtroom is a hallowed place where trials must proceed with dignity and not become occasions for entertainment by the participants, by extraneous persons, by modern mass media, or otherwise.

My difficulty is not with the basic hypothesis of this decision, but with the use of this case to establish the appropriate guidelines for judicial control.

This is a stale case, the trial having taken place nearly 13 years ago. That lapse of time is not necessarily a barrier to a challenge of the constitutionality of a criminal conviction. But in this case it should be.

There is more than an intimation in the present record that the defendant was a mental case. The passage of time since 1957, the date of the trial, makes it, however, impossible to determine what the mental condition of the defendant was at that time. The fact that a defendant has been found to understand "the nature and object of the proceedings against him" and thus competent to stand trial[1] does not answer the difficult questions as to what a trial judge should do with an

[1] See n. 5, infra.

otherwise mentally ill defendant who creates a court-room disturbance. What a judge should do with a defendant whose courtroom antics may not be volitional is a perplexing problem which we should not reach except on a clear record. This defendant had no lawyer and refused one, though the trial judge properly insisted that a member of the bar be present to represent him. He tried to be his own lawyer and what transpired was pathetic, as well as disgusting and disgraceful.

We should not reach the merits but should reverse the case for staleness of the record and affirm the denial of relief by the District Court. After all, behind the issuance of a writ of habeas corpus is the exercise of an informed discretion. The question, how to proceed in a criminal case against a defendant who is a mental case, should be resolved only on a full and adequate record.

Our real problems of this type lie not with this case but with other kinds of trials. *First* are the political trials. They frequently recur in our history[2] and insofar

[2] From *Spies* v. *People*, 122 Ill. 1, 12 N. E. 865, involving the Haymarket riot; *In re Debs*, 158 U. S. 564, involving the Pullman strike; *Mooney* v. *Holohan*, 294 U. S. 103, involving the copper strikes of 1917; *Commonwealth* v. *Sacco*, 255 Mass. 369, 151 N. E. 839, 259 Mass. 128, 156 N. E. 57, 261 Mass. 12, 158 N. E. 167, involving the Red scare of the 20's; to *Dennis* v. *United States*, 341 U. S. 494, involving an agreement to teach Marxism.

As to the Haymarket riot resulting in the *Spies* case, see 2 J. Commons and Associates, History of Labour in the United States 386 *et seq.* (1918); W. Swindler, Court and Constitution in the Twentieth Century, cc. 3 and 4 (1969).

As to the Pullman strike and the *Debs* case, see L. Pfeffer, This Honorable Court 215–216 (1965); A. Lindsey, The Pullman Strike, cc. XII and XIII (1942); Commons, *supra,* at 502–508.

As to the *Mooney* case, see the January 18, 1922, issue of The New Republic; R. Frost, The Mooney Case (1968).

As to the *Sacco-Vanzetti* case see Fraenkel, The Sacco-Vanzetti Case; F. Frankfurter, The Case of Sacco and Vanzetti (1927).

As to the repression of teaching involved in the *Dennis* case, see O. Kirchheimer, Political Justice 132–158 (1961).

as they take place in federal courts we have broad supervisory powers over them. That is one setting where the question arises whether the accused has rights of confrontation that the law invades at its peril.

In Anglo-American law, great injustices have at times been done to unpopular minorities by judges, as well as by prosecutors. I refer to London in 1670 when William Penn, the gentle Quaker, was tried for causing a riot when all that he did was to preach a sermon on Grace Church Street, his church having been closed under the Conventicle Act:

> "*Penn.* I affirm I have broken no law, nor am I Guilty of the indictment that is laid to my charge; and to the end the bench, the jury, and myself, with these that hear us, may have a more direct understanding of this procedure, I desire you would let me know by what law it is you prosecute me, and upon what law you ground my indictment.
>
> "*Rec.* Upon the common-law.
>
> "*Penn.* Where is that common-law?
>
> "*Rec.* You must not think that I am able to run up so many years, and over so many adjudged cases, which we call common-law, to answer your curiosity.
>
> "*Penn.* This answer I am sure is very short of my question, for if it be common, it should not be so hard to produce.
>
> "*Rec.* Sir, will you plead to your indictment?
>
> "*Penn.* Shall I plead to an Indictment that hath no foundation in law? If it contain that law you say I have broken, why should you decline to produce that law, since it will be impossible for the jury to determine, or agree to bring in their verdict, who have not the law produced, by which they should measure the truth of this indictment, and the guilt, or contrary of my fact?

"*Rec.* You are a saucy fellow, speak to the Indictment.

"*Penn.* I say, it is my place to speak to matter of law; I am arraigned a prisoner; my liberty, which is next to life itself, is now concerned: you are many mouths and ears against me, and if I must not be allowed to make the best of my case, it is hard, I say again, unless you shew me, and the people, the law you ground your indictment upon, I shall take it for granted your proceedings are merely arbitrary.

.        .        .        .        .

"*Rec.* The question is, whether you are Guilty of this Indictment?

"*Penn.* The question is not, whether I am Guilty of this Indictment, but whether this Indictment be legal. It is too general and imperfect an answer, to say it is the common-law, unless we knew both where and what it is. For where there is no law, there is no transgression; and that law which is not in being, is so far from being common, that it is no law at all.

"*Rec.* You are an impertinent fellow, will you teach the court what law is? It is 'Lex non scripta,' that which many have studied 30 or 40 years to know, and would you have me to tell you in a moment?

"*Penn.* Certainly, if the common law be so hard to be understood, it is far from being very common; but if the lord Coke in his Institutes be of any consideration, he tells us, That Common-Law is common right, and that Common Right is the Great Charter-Privileges . . . .

"*Rec.* Sir, you are a troublesome fellow, and it is not for the honour of the court to suffer you to go on.

*"Penn.* I have asked but one question, and you have not answered me; though the rights and privileges of every Englishman be concerned in it.

*"Rec.* If I should suffer you to ask questions till to-morrow morning, you would be never the wiser.

*"Penn.* That is according as the answers are.

*"Rec.* Sir, we must not stand to hear you talk all night.

*"Penn.* I design no affront to the court, but to be heard in my just plea: and I must plainly tell you, that if you will deny me Oyer of that law, which you suggest I have broken, you do at once deny me an acknowledged right, and evidence to the whole world your resolution to sacrifice the privileges of Englishmen to your sinister and arbitrary designs.

*"Rec.* Take him away. My lord, if you take not some course with this pestilent fellow, to stop his mouth, we shall not be able to do any thing to night.

*"Mayor.* Take him away, take him away, turn him into the bale-dock." [3] The Trial of William Penn, 6 How. St. Tr. 951, 958–959.

The panel of judges who tried William Penn were sincere, law-and-order men of their day. Though Penn was acquitted by the jury, he was jailed by the court for his contemptuous conduct. Would we tolerate removal of a defendant from the courtroom during a trial because he was insisting on his constitutional rights, albeit vociferously, no matter how obnoxious his philosophy might have been to the bench that tried him? Would we uphold contempt in that situation?

---

[3] At Old Bailey, where the William Penn trial was held the baledock (or baildock) was "a small room taken from one of the corners of the court, and left open at the top; in which, during the trials, are put some of the malefactors." Oxford Eng. Dict.

Problems of political indictments and of political judges raise profound questions going to the heart of the social compact. For that compact is two-sided: majorities undertake to press their grievances within limits of the Constitution and in accord with its procedures; minorities agree to abide by constitutional procedures in resisting those claims.

Does the answer to that problem involve defining the procedure for conducting political trials or does it involve the designing of constitutional methods for putting an end to them? This record is singularly inadequate to answer those questions. It will be time enough to resolve those weighty problems when a political trial reaches this Court for review.

*Second* are trials used by minorities to destroy the existing constitutional system and bring on repressive measures. Radicals on the left historically have used those tactics to incite the extreme right with the calculated design of fostering a regime of repression from which the radicals on the left hope to emerge as the ultimate victor.[4] The left in that role is the provocateur. The Constitution was not designed as an instrument for that form of rough-and-tumble contest. The social compact has room for tolerance, patience, and restraint, but not for sabotage and violence. Trials involving that spectacle strike at the very heart of constitutional government.

I would not try to provide in this case the guidelines for those two strikingly different types of cases. The case presented here is the classical criminal case without any political or subversive overtones. It involves a defendant who was a sick person and who may or may

---

[4] As respects the strategy of German Communists *vis-à-vis* the Nazis in the 1930's, see K. Heiden, Der Fuehrer 461, 462, 525, 551–552 (1944).

not have been insane in the classical sense [5] but who apparently had a diseased mind. And, as I have said, the record is so stale that it is now much too late to find out what the true facts really were.

---

[5] In a 1956 pretrial sanity hearing, Allen was found to be incompetent to stand trial. Approximately a year later, however, on October 19, 1957, in a second competency hearing, he was declared sane and competent to stand trial.

Allen's sister and brother testified in Allen's behalf at the trial. They recited instances of Allen's unusual past behavior and stated that he was confined to a mental institution in 1953, although no reason for this latter confinement was given. A doctor called by the prosecution testified that he had examined Allen shortly after the commission of the crime which took place on August 12, 1956, and on other subsequent occasions, and that, in his opinion, Allen was sane at the time of each examination. This evidence was admitted on the question of Allen's sanity at the time of the offense. The jury found him sane at that time and the Illinois Supreme Court affirmed that finding. See *People* v. *Allen*, 37 Ill. 2d 167, 226 N. E. 2d 1.

At the time of Allen's trial in 1957, the tests in Illinois for the defendant's sanity at the time of the criminal act were the M'Naghten Rule supplemented by the so-called "irresistible impulse test." *People* v. *Carpenter*, 11 Ill. 2d 60, 142 N. E. 2d 11. The tests for determining a defendant's sanity at the time of trial were that "[h]e should be capable of understanding the nature and object of the proceedings against him, his own condition in reference to such proceedings, and have sufficient mind to conduct his defense in a rational and reasonable manner," and, further, that "he should be capable of co-operating with his counsel to the end that any available defenses may be interposed." *People* v. *Burson*, 11 Ill. 2d 360, 369, 143 N. E. 2d 239, 244–245.