288 So.2d 166

### Robert Earl KEEBY

v.

### STATE.

### 6 Div. 607.

Court of Criminal Appeals of Alabama.

Jan. 2, 1974.

———◆———

James H. Hard, IV, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Samuel L. Adams, Sp. Asst. Atty. Gen., Dothan, for the State.

**HARRIS, Judge.**

Appellant was convicted of robbery and sentenced to imprisonment in the penitentiary for a term of thirty-five (35) years. At arraignment appellant, attended by court-appointed counsel, pleaded not guilty. Another attorney was appointed to represent him on this appeal. He was furnished a free transcript.

On the night of November 10, 1971, three black men armed with pistols entered the Liberty Supermarket located at 420 13th Street, North, Birmingham, Alabama, and robbed the store of around $36,-000.00. They were apprehended within a few days, charged with robbery and denied bail.

The crime was conceived in a motel in Mobile where appellant, his girlfriend, and the other two gunmen had rooms. Appellant's girlfriend testified for the state. She said appellant had a drawing of the interior of the supermarket and gave directions as to what all would do when they entered the store. The first thing they had to do was to disarm the security guard and to kill him if necessary. One was to stand guard at the store entrance; one was to hit the cash registers, and appellant was to get the money from the safe inside the office. They executed the plan precisely as instructed by appellant. Appellant and one of the others walked up behind the security guard and appellant took his pistol and his handcuffs. They made the guard lie on the floor and handcuffed his hands behind his back, and then they carried out their assigned duties. After the robbery, appellant called his girlfriend in Mobile and told her they had successfully "pulled the job", but his brother got caught. He told her to catch a bus and come to Birmingham.

The store employees identified two of the robbers in a lineup and they identified appellant from a number of photographs exhibited to them by police officers.

At the outset appellant employed two lawyers to represent him. They asked the court to relieve them as his counsel because he would not cooperate with them in preparing his defense. Over a period of time, exceeding one year, different judges calling the criminal docket appointed counsel to represent appellant and set a trial date. Invariably appellant appeared and advised the court that he did not want to be represented by the attorney appointed by the court and asked for a continuance so that he could employ his own counsel. Each time appellant's case was called, he objected to the lawyer appointed to represent him and he got his case continued. At no time did he say he would conduct his own defense. Finally, Judge Wallace Gibson, Senior Judge of the Criminal Division of the Circuit Court of Jefferson County, assigned this case to himself. He called appellant for arraignment and appointed another attorney to represent him.

On the date set by Judge Gibson for trial the last appointed attorney told the

court appellant did not want him to represent him and asked to be relieved. He told the court that appellant simply would not cooperate with him. The experienced trial judge recognized appellant's pattern of conduct. He realized that appellant was using his vocal dissatisfaction with appointed counsel to keep from going to trial and that appellant would have objected to a Clarence Darrow. He just did not want a trial at all. The court put him to trial.

Appellant was brought to the courtroom shackled and he immediately embarked upon a course of conduct well calculated to disrupt, impede and thwart the orderly processes of a trial in keeping with the constitutional mandates and to make a complete farce of the trial proceedings. He belched forth insult after insult, hurled epitaphs after epitaphs, diatribes following diatribes, acrimony heaped upon acrimony, and scrambled metaphors in a voice pitched to such a high key that the court reporter was unable to record the exchange of words between the judge and the obstreperous defendant. The record is replete with the following notations of the court reporter:

"(Thereupon, the defendant interrupted and drowned out the court, with the result that the balance of the statement of the court and the statement of the defendant were incomprehensible.)"

At one point during the preliminary proceedings the court was forced to have appellant removed from the courtroom. When he returned, he continued his interruptions and the court threatened to gag him just to allow the judge to be able to talk to him.

The following are some, but not all, examples of appellant's outbursts:

"No, I have made up my mind that I am not going to be tried."

"I have made up my mind that I am not going to be tried under these auspices."

"That is what I have made up my mind to."

"I also charge that you are prejudiced in my case."

"I am not yelling anything."

"It is my job to look after me."

"Do you think I am going to let my life go like that?"

"This is a conspiracy here by the judge, here, the prosecution, and my attorney to defraud me of my life."

"My life is on the line, and you are too partial in this case."

"You have directed yourself to be my personal dictator."

"I am not going to stand for this."

"I am not trying to take the prerogative of presiding over anything."

"You have made the blatant statement about me in open court and told vicious tales on me right here in this courtroom, in front of all these people, here, except the jury."

"You made a statement that had me bound and chained."

"You only take the chains off when they (the Jury) come in."

"You should dismiss yourself from this case."

"You already have in your mind a set idea what you are going to do anyway."

"You already have a pre-set idea what you are going to do today."

"You can do what you want to. You got plenty of help."

"God, or something. This is the way you conduct the proceedings. Yet, you call yourself a judge."

"What kind of judge do you call that?"

On twenty-eight (28) pages of the record appellant interrupted the trial court and the proceedings well over one hundred times.

From the record:

"Ladies and gentlemen, I don't think it would be well—I have two choices:

"I can either have this man bound and gagged and kept in the courtroom, but he could still create a disturbance, and I don't think that it is good to have someone sitting there on the jury watching him bound and gagged.

"The other alternative is that I put him outside the courtroom and proceed with the trial, which I don't like to do, because a person does really have a constitutional right to be in the courtroom and to be present when they are tried.

"But, rather than to go into this business of gagging this man and binding him and sitting him in front of you, here, in chains, I am going to put him out of the courtroom, but I am going to go one step further than the Supreme Court says is necessary.

"I have arranged to have some equipment whereby he may hear the testimony of the witnesses, and it is going to take a few minutes to set this up.

"THE DEFENDANT: You already had this arranged, huh?

"THE COURT: Now, Robert Earl Keeby, I have set up this equipment, and, if at any time, including now, you want to tell me that you are prepared to conduct yourself in an orderly manner and not have these outbursts, where you address the jury in the manner in which you have been doing, of course at that point you may remain in the courtroom."

Following this there were repeated outbursts from the appellant and he was removed from the courtroom. However, before he was removed the court told appellant that he would be permitted to listen to the testimony of every witness and to make notes to send his attorney to aid him in conducting the cross-examination of the state's witnesses. Appellant's attorney was advised that any time he felt he should confer with his client the trial would be interrupted for such conferences. This was done on several occasions. The court further told appellant that at any time he decided he would behave himself to tell the bailiff and he would be brought back to the courtroom unshackled. After a short absence appellant asked the bailiff to notify the court of his desire to return. He was brought into the courtroom and the trial proceeded to a conclusion without further interruptions.

On November 13, 1973, in the case of Martin v. State, 51 Ala.App. 405, 286 So.2d 80, in dealing with a situation somewhat similar to the instant case, we said:

"A prisoner undergoing trial should not be in irons, shackled, manacled, or otherwise fettered unless the situation creates a reasonable belief that such restraint is necessary to prevent his escape or rescue. This principle is deeply rooted in the ancient common law and was noted by Sir William Blackstone, 4th Com. 322, where he said, 'The prisoner must be brought to the bar without irons, or any manner of shackles or bonds, unless there be evident danger of escape, and then he may be secured with irons.' "

This case is controlled by another principle of law of equal importance. Court proceedings must not be infected with scurrilous, abusive language and conduct and courts must not be bullied, insulted, and humiliated by defendants brought before them charged with crimes.

A case squarely in point is Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). In this case, the Supreme Court said there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant: (1)

bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly. That court went on to say:

"Another aspect of the contempt remedy is the judge's power, when exercised consistently with state and federal law, to imprison an unruly defendant such as Allen for civil contempt and discontinue the trial until such time as the defendant promises to behave himself. This procedure is consistent with the defendant's right to be present at trial, and yet it avoids the serious shortcomings of the use of shackles and gags. It must be recognized, however, that a defendant might conceivably, as a matter of calculated strategy, elect to spend a prolonged period in confinement for contempt in the hope that adverse witnesses might be unavailable after a lapse of time. A court must guard against allowing a defendant to profit from his own wrong in this way.

"The trial court in this case decided under the circumstances to remove the defendant from the courtroom and to continue his trial in his absence until and unless he promised to conduct himself in a manner befitting an American courtroom. As we said earlier, we find nothing unconstitutional about this procedure. Allen's behavior was clearly of such an extreme and aggravated nature as to justify either his removal from the courtroom or his total physical restraint. Prior to his removal he was repeatedly warned by the trial judge that he would be removed from the courtroom if he persisted in his unruly conduct, and, as Judge Hastings observed in his dissenting opinion, the record demonstrates that Allen would not have been at all dissuaded by the trial judge's use of his criminal contempt powers. Allen was constantly informed that he could return to the trial when he would agree to conduct himself in an orderly manner. Under these circumstances we hold that Allen lost his right guaranteed by the Sixth and Fourteenth Amendments to be present throughout his trial.

\* \* \* \* \* \*

"We do not hold that removing this defendant from his own trial was the only way the Illinois judge could have constitutionally solved the problem he had. We do hold, however, that there is nothing whatever in this record to show that the judge did not act completely within his discretion. Deplorable as it is to remove a man from his own trial, even for a short time, we hold that the judge did not commit legal error in doing what he did."

Appellant would have welcomed contempt proceedings in multiples of hundreds of times in hopes that the state's witnesses would leave the jurisdiction of the court and never be available for trial. Nothing would have suited him better than the maximum punishment for contempt—five days and fifty dollars—and thereby have his robbery case continued indefinitely.

In a concurring opinion in *Allen*, Mr. Justice Brennan made reference to the technological age in which we live and hinted that sophisticated electronic devices could be utilized to keep an absent defendant fully informed of the trial proceeding. This procedure is not one of the requirements of *Allen* but Judge Gibson took the hint and said:

"I do not have any two-way equipment. This equipment we have got here and lined up, actually, as you know the Supreme Court has not required that, but I think I would be remiss as a judge if I did not—if I could improve on the Supreme Court decision—if I didn't try to improve on it—and that is what I have attempted to do."

Because of the abusive and disorderly conduct of appellant as shown above, a less experienced trial judge might have been entrapped into committing reversible error.

Judge Gibson remained calm and collected, exercising the utmost judicial restraint, demonstrating the patience of Job, was in full command, and presided over this trial with that degree of courtroom decorum that has to be the despair of emulation.

Affirmed.

All the Judges concur.