**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Patrice DONALDSON, Defendant–Appellant.**

**No. 02–2426.**

United States Court of Appeals, Sixth Circuit.

Sept. 15, 2004.

---

Before BATCHELDER and DAUGHTREY, Circuit Judges; and DOWD, Senior District Judge.*

**OPINION**

DOWD, District Judge.

Patrice Donaldson, the defendant-appellant, charged in a multi-defendant case with conspiring with intent to possess and distribute heroin and cocaine, was found guilty after a three-day jury trial. The testimony in the trial was completed on the second day of the trial. The government's opening statement identified its three witnesses, Anthony Burns, Terese Burns and Steven Harris, all co-defendants in the multi-defendant conspiracy. Their testimony, if deemed credible by the jury, was sufficient to support Donaldson's conviction. The jury found Donaldson responsible for one kilogram or more of heroin and 500 or more grams of cocaine. Donaldson received a life sentence based on two prior felony drug convictions.

The primary issues raised on appeal challenge the district court's handling of the series of verbal outbursts by Donaldson in the presence of the jury during the trial.[1]

Before we consider the district court's response to Donaldson's outbursts in front of the jury, we note that no claim is made

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. The competency of the defendant was raised pre-trial and again post-trial. Both times the district court, after hearing from witnesses, found the defendant competent to stand trial.

that the evidence was insufficient to support Donaldson's conviction.

Donaldson's first outburst came as soon as the first government witness, Anthony Burns, provided incriminating testimony. The following colloquy took place in the presence of the jury:

Q. Can you give us—you don't have to list everybody, but some of the names of the people who were working with you who were located here in Detroit?

A. Yes. There was Steven Harris, David Wynn, Christopher Lewis, a few others.

Q. Okay. Terese Burns?

A. Yes.

Q. That's your sister?

A. That is my sister.

Q. Ricky Burns?

A. Yes. That's my brother.

Q. They are both charged in this case also; is that right?

A. Yes. Yes.

Q. Who were some of the people who were located in New York who were working with you on this enterprise?

A. There was Patrick Donaldson; Elvis, I don't have no last name; Novus, no last name.

MR. DONALDSON: You're lying man. He's sitting up here lying on me, man.

MR. GUREWITZ: Your Honor, I would ask that you instruct the Defendant.

THE COURT: Mr. Donaldson, you will have the opportunity through your attorney to challenge this witness. So please wait until that time. Thank you.

MR. DONALDSON: I'm looking at life in prison. He's trying to give me life in prison and he's sitting up here lying.

THE COURT: Mr. Donaldson.

Thank you. You may continue.

Tr., Vol. I at 83–84.

The next outburst soon followed, still during the direct examination of Anthony Burns in the following colloquy:

Q. And what about Patrick Donaldson, did he engage in credit transactions with you?

A. Yes.

Q. In what way?

A. He fronted us some drugs.

Q. Okay. For payment later?

A. Yes.

MR. DONALDSON: Did I ever give you drugs, man? Are you going to lie on me, man?

THE COURT: Mr. Donaldson.

MR. DONALDSON: I'm facing life and he's going to lie. You know I never gave you no drugs, and you're going to sit up there and lie, man.

THE COURT: Mr. Donaldson.

You may approach, Mr. Gurewitz.

(Bench conference held out of the hearing of the jury, between the Court and counsel, on the record as follows:)

MR. GUREWITZ: Your Honor, I don't think that Mr. Donaldson is doing this intentionally. I think he is just having some difficulty controlling himself. Maybe a break might be appropriate to talk with him separately.

MR. CHADWELL: I don't object to a break.

THE COURT: How strenuously do you object to his outbursts? I think the jury—

MR. CHADWELL: I'm not asking that he be gagged or anything like that.

THE COURT: No. I'm wondering if we even need a break. Do you think he needs a break to calm down, Mr. Gurewitz, or do you think by having this

conversation he has the time to calm down?

I will trust your judgment.

MR. GUREWITZ: Really—just after the first one he apologized to me, and I think he had realized that he had made a mistake.

THE COURT: Why don't you just bring him up to sidebar if you have no objection to that or—

MR. GUREWITZ: I would rather not call anymore attention to that.

The juror in the front row in the white shirt just stood. I don't know if that means he has a question or not for the Court.

THE COURT: No. I just told them they could have a break.

Do you want to have a break, Mr. Gurewitz? It is your call.

MR. GUREWITZ: I just don't want to call any undue attention to it. I'm concerned that it is going to happen again.

THE COURT: If it happens again, we'll take a break.

Okay.

(End of Bench conference.)

Tr., Vol. I at 85–87.

The third statement of the defendant, still during the direct examination of Anthony Burns, expressed relief on the part of the defendant in the following passage:

BY MR. CHADWELL:

Q. Why did your sister introduce you to Patrick Donaldson?

A. So we could hook up on some drugs.

Q. Okay. What was Patrick Donaldson's role in your operation?

A. Pretty much the supply.

Q. Of what?

A. Of heroin—

Q. What about cocaine?

A. —pretty much. We tried to arrange some cocaine.

Q. You never actually got cocaine from him?

A. No.

Q. Is that correct?

A. No.

MR. DONALDSON: Thank God.

Tr., Vol I at 91.

Donaldson again commented on the testimony of Anthony Burns in the following passage:

BY MR. CHADWELL:

Q. What's the least amount—based upon your knowledge and experience, in your opinion, having seen the heroin and having taken delivery of it, what's the absolute minimum amount that that would have been?

A. I would have to say 300 grams.

Q. 300 grams?

A. Yes.

Q. And how did you know that this heroin came from Patrick Donaldson?

A. First of all, I talked to him about it, and it was his.

It belonged to him.

MR. DONALDSON: That's a lie, man.

Tr., Vol I at 101.

Donaldson's final comment during the testimony of Anthony Burns came in the following passage:

Q. Did he have any other of his associates present with him when he met with you?

A. Yes.

Q. Who were they?

A. That was Elvis. I don't know his last name.

MR. DONALDSON: That's who gave you the drugs.[2]

Tr., Vol I at 103.

On the second day of the trial, the second government witness, co-defendant Terese Burns, testified on direct examination and incriminated the defendant. Again, as soon as the witness incriminated the defendant, the following colloquy took place:

Did you meet Patrick face-to-face?

A. Yes, I did.

Q. How many times have you met Patrick face to face?

A. Seven times or more.

MR. DONALDSON: Why are you lying? Why are you sitting there lying?

BY MR. CHADWELL:

Q. Did any of those meetings occur outside the state of Michigan or—

MR. DONALDSON: She's lying on me.

A. I didn't hear.

MR. CHADWELL: Your Honor, I would ask that you instruct the Defendant to speak quiet enough to have a question and answer—

THE COURT: You may continue. I think Mr. Donaldson knows the—

Mr. Donaldson—

MR. DONALDSON: I'm looking at life in prison, Your Honor, and this woman is lying on me.

I didn't give you no drugs to see. Tell them about Marque. That is what you need to do, is tell the truth.

THE COURT: Mr. Donaldson.

2. The record of the first day of the trial indicates at the end of the day the following commentary:

THE COURT: And, Mr. Donaldson, I want to commend you for your restraint after your outbursts. I trust that you will be further in control tomorrow.

MR. DONALDSON: I'm not going to sit here and let ya'll bury me. The only reason—

THE COURT: Will counsel approach the bench, please.

MR. DONALDSON: Excuse me, Your Honor. Your Honor? I just found out yesterday my sister was in the World Trade Center bombing and she almost got burned in that disaster. I apologize for this outbreak but this—

THE COURT: You may sit down.

MR. DONALDSON: But this has kind of taken a toll on my life here. I'm just letting you know that she just escaped from death. I haven't seen her in over four years.

(Bench conference held out of the hearing of the jury, between the Court and counsel), on the record as follows:

THE COURT: Are we ready?

I figure if he has about 40 seconds to cool down, he will get himself back under control.

MR. GUREWITZ: Judge.

THE COURT: Go on, Mr. Gurewitz.

(Mr. Donaldson continues to make comments in open court, which were not recorded on the record, at the same time the side bar conference between the Court and counsel is being conducted on the record.)

MR. GUREWITZ: I thought about having a discussion with him and telling him that you've got the authority to have him taken out of the courtroom during the trial. But I'm not sure if that will set him off even more.

MR. DONALDSON: My apologies to you, sir.

THE COURT: Accepted. Thank you.

We are in recess.

(Proceedings adjourned at 12:48 p.m.)

Tr., Vol. I at 153–54.

THE COURT: I don't think that's necessary at this point. And I just hope that—and I know you've explained to him that he has already hurt himself by letting the jury hear his voice and compare it to the tapes. And that's the risk he's taking.

I think if we just wait about another minute here, he'll have calmed down.

MR. GUREWITZ: He told me that he had a hard night. He didn't feel well. In fact, I did tell him yesterday—I talked to his sister yesterday, who told me that she was in the World Trade Center on the 34th floor, and had to walk down the stairs and was able to get out, and the ambulance she had gotten out of collapsed. He is upset, I think.

THE COURT: Okay. I am going to excuse the jury.

(End of bench conference.)

MR. DONALDSON: My sister had to face the disaster in the World Trade Center bombing.

THE COURT: We are going to take a recess. The jury should go to the jury room. We'll take a break for ten minutes. Remember, don't talk to each other about the case.

(Jury leaves the courtroom at 9:23 a.m.)

THE COURT: Everyone may be seated.

Witness, you may take a ten-minute break also.

THE WITNESS: Thank you.

THE COURT: Please be back here at 25 to ten.

(Witness leaves the courtroom.)

THE COURT: Mr. Donaldson, you're not helping yourself. I understand the trauma of finding out that your sister was almost killed in the World Trade Center.

MR. DONALDSON: Your Honor, I am facing time on a wrongful conviction. These people are trying to bury me some more.

THE COURT: Mr. Donaldson, you have a chance of getting an acquittal in this case.

MR. DONALDSON: I can't see that from this lying testimony. The jury believes—

THE COURT: I don't know what the jury believes, but I can tell you that your outbursts are not helping your case for two reasons. One, the obvious reason of they are going to maybe like you less because of your outbursts; and the other probably equal reason, if part of the Government's case has to do with tapes, now the jury has heard your voice. But that was your choice.

I would suggest you limit the damage by trying to control yourself.

MR. DONALDSON: I promise I will not do it again.

THE COURT: Well, I would like to believe you and I do believe you. But you have to do better than that. Your life is on the line.

MR. DONALDSON: I have a medical condition. After counsel broke the news to me, I was refused aspirins or Tylenol. I have a reversible colostomy, and I also have a bullet in my lung that I am suffering from.

If Your Honor would look into the first case from '96 when this incident all started, the only reason why the Government is prosecuting me is because their office falsified my case against me from the '97 case. And I raised these issues, and they have yet to respond to it.

So, they come now with an indictment—they got the indictment over-

turned, and they come with a superseding indictment. And I am supposed to sit here and let them put all the burden on. I am not going to sit here and let them do it.

THE COURT: Mr. Donaldson, the last thing I am going to hold you to is what you said. And that is that there would be no more outbursts in front of the jury.

MR. DONALDSON: I'll do that, sir.

THE COURT: So, calm down. We will have somebody bring some aspirins to you if you need that.

MR. DONALDSON: I appreciate that, sir.

THE COURT: We are going to take a break for a few minutes, and I will have somebody bring some aspirin to you.

(Recess taken.)

(Jury enters courtroom at 9:38 a.m.)

Tr., Vol II at 42–46.

■ The primary claim advanced by Donaldson is that the district court had a *sua sponte* duty to stop the trial and conduct an additional competency hearing after the repeated outbursts. We review such a claim for clear error and we find no such error. The options available to a trial judge when confronted with a disruptive defendant were discussed in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Justice Black, writing for the court, provided directions to trial courts confronted with disruptive defendants as he opined:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. *We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.* We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly. Emphasis added.

*Id.* at 343–44.

In this case, the district court elected to counsel Donaldson rather than select one of the more onerous possibilities described in *Allen, supra.* The district court advised Donaldson, in the absence of the jury, that his outbursts were not helping him.

We find that the options available to the trial court when confronted with a disruptive defendant must, of necessity, be subject to the discretion of the trial court who is in a far better position than a reviewing court to select a sanction best suitable to the unique situation. The record in this case is devoid of any error, clear or otherwise, in the careful manner in which the district court handled the repeated outbursts of Donaldson. We reject Donaldson's appellate argument that the district court, on the strength of this record, was required to stop the trial and conduct an additional competency hearing.

A review of the record indicates that Donaldson, in front of the jury, and without testifying, challenged the testimony of two of the three witness against him. Moreover, he advised the jury of the severe sentence he was facing and attempted to enlist the sympathy of the jury because his sister's life was threatened in the Sep-

tember 11, 2001 destruction in New York City.

We find no basis for disagreement with the district court's observation that Donaldson's outbursts were strategic as opposed to those of a defendant suffering from a competency deficiency. In denying the motion for a new trial, the district court observed:

> And while counsel has argued that his mental state made it impossible for him to assist counsel, nothing that I saw during the trial would indicate that, except for what had been referred to, the outbursts. And the only time there were outbursts, there were several of them, but they were, as the Government has indicated, strategically appropriate in the sense that Mr. Donaldson was able to present to the jury his view that these witnesses were lying without having to be cross-examined.

JA at 283–84.

■ Donaldson seeks a new trial based on flagrant prosecutorial misconduct based primarily on the government's final argument. Donaldson's voice was an issue as evidence involving wiretaps was introduced with witnesses identifying the voice as that of Donaldson. Against that background, in final argument the government's attorney stated:

> Well, his testimony is corroborated by two other witnesses, for starters. It's corroborated by the tapes, right? You heard him on the tapes. He has this whole scenario where Patrick is passing messages through his sister. Well, you heard that was true for yourself, didn't you? He says he's engaged in cocaine— in heroin transactions with Patrick. You heard that on the tape.

> You don't even have to rely on him to know that was Patrick's voice, because Mr. Donaldson chose to scream out at various times in the trial, and you had the opportunity to hear his voice and his distinctive Jamaican accent, which you can also hear on the tape. You can hear it for yourself.

JA at 230.

Donaldson alleges prosecutorial misconduct in that argument as he did not testify and moved for a new trial on the basis of the government's argument. The district court denied the motion based on the invitation of the government to compare the voice on the tapes with that of Donaldson as heard in the courtroom because the characteristics of speech, tone of voice, accent and the like are not protected by the Fifth Amendment. (JA at page 284, lines 6–9). We agree with the district court and find no merit in the claim of flagrant prosecutorial misconduct.[3]

■ The defendant was serving a 71-month federal sentence when indicted in this case. The indictment was returned on May 11, 1999, but the defendant was not arraigned until October 25, 2000 and his jury trial commenced on October 2, 2001. The defendant moved for a dismissal of the indictment based on pre-arraignment delay. The motion was denied by the district court during a hearing conducted on April 2, 2001. The district court denied the motion to dismiss, but without prejudice to a renewal of the motion if the defendant was able to "show actual prejudice in preparing for the trial, if you can show witnesses that have banished [sic] or become unavailable because of the delay or something of that nature." JA at 81. No claim is advanced that Donaldson was denied a statutory speedy trial nor did he renew his

---

3. Other claims of prosecutorial misconduct, including repeated use of leading questions and vouching for witnesses, are without merit.

motion to dismiss for pre-arraignment delay. Thus, we find no error in the denial of the motion to dismiss for pre-arraignment delay.

■ Finally, the defendant contends that the life sentence based on the conviction involving the quantity of the heroin and cocaine plus the fact of the two prior felony drug convictions constitutes cruel and unusual punishment under the Eighth Amendment. This contention has been addressed and rejected by this court. See *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir.1994) and *United States v. Flowal*, 163 F.3d 956, 963 (Sixth Cir.1998)

The conviction and sentence are affirmed.