hMARVIN, Chief Judge.
Joe Whitehead appeals his conviction of aggravated rape of a victim under the age of twelve years after being found guilty by a jury of that crime and being given the mandatory life sentence without benefit. LSA-R.S. 14:42, subd. A(4).
Considering his argued and briefed assignments that assert the evidence was legally insufficient to convict, we affirm.

FACTS

Carrie Bowie informed the police in November 1993 that Joe Whitehead had sexually molested her granddaughter, A.B., born January 10, 1987. For about two years, 1992-1994, Whitehead lived with A.B., her siblings and her mother, who was Carrie Bowie’s daughter, Jacqueline Bowie. Although first cousins, Whitehead and Jacqueline Bowie lived together in an intimate relationship.
Despite Jacqueline Bowie’s initial disbelief of what the grandmother reported to her in 1993, A.B.’s mother had her undergo a physical examination at the L.S.U. Medical Center which did not reveal signs of sexual abuse. Child Protection Services investigated, concluding that there was unspecified sexual abuse. The agency, however, did not accept the case because it deemed- A.B. not in danger. Whitehead moved out of the Bowie home in July 1994, but continued frequently visiting there.
In December 1994, Jacqueline Bowie called the police after A.B., for the first time, personally told her about Whitehead’s actions. The police closed the case, however, after Jacqueline Bowie and A.B. failed to keep an appointment with the investigating officer on January 4,1995.
A.B. subsequently began living with her father, Andre Wilson, telling him about Whitehead’s conduct toward her. Wilson reported Whitehead’s sexual abuse of A.B. to *277 the police in February 1995. AJB. underwent physical 12exannnations on February 17, 1995 and May 16, 1995, which indicated that she had been sexually abused.
Indicted by a grand jury on September 28, 1995, Whitehead was charged with aggravated rape of A.B., a victim under the age of twelve years. R.S. 14:42(A)(4). Following a 3-]é day trial, the jury returned a unanimous verdict of guilty as charged.
A.B., nine years old at trial and correctly found competent as a witness, testified that she was living with her siblings, her mother and Whitehead in an apartment on North Market Street in Shreveport. Whitehead, unemployed, cared for A.B. and her siblings after school while Jacqueline Bowie worked at Libby Glass. A.B. testified that, while her mother was not at home and her sister and brother were asleep, Whitehead would touch her in a way that she didn’t think he was supposed to. A.B. stated that Whitehead “started rubbing on my legs and then he put his hand inside my clothes and started rubbing inside my clothes.” A.B. explained that Whitehead would rub inside of her underwear, on her “privates” and that Whitehead stuck his finger inside of her “private.” A.B. explained that she did not initially reveal these incidents to anyone because Whitehead threatened to whip her if she told anyone.
In March or April 1998, the Bowies moved from the apartment to a house on Windsor street, where ’Whitehead’s sexual abuse of A.B. continued. A.B. testified that Whitehead “started feeling on me and he stuck his private inside my private.” Again, Whitehead performed these actions when Jacqueline Bowie was not at home and while A.B.’s brother was asleep (A.B.’s sister no longer lived with the family, having moved to live with her grandmother). A.B. stated that Whitehead touched her “private” with his hand and his “private.” According to A.B., Whitehead placed his “private” inside of her private and moved his “private” Uaround. According to A.B., Whitehead also “licked” between her legs. A.B. said that she never told Whitehead to stop because she was afraid he would whip her.
A.B. testified that Whitehead put his “private” in her “private” one time, but put his finger inside of her more than once. A.B. had stated to the grand jury, however, that Whitehead put his “private” in her “private” more than one time. At trial, A.B. remained adamant on cross examination that “Whitehead placed his “private” inside of her on one occasion and put his hand inside of her more that once, despite her being confronted with her previous statements to the contrary.
A.B. first reported Whitehead’s actions to her grandmother in late 1993. She testified that when she initially told her grandmother about the incidents, Whitehead had already placed his “private part” in her “private part.” After additional questioning, A.B. stated Whitehead had just put his finger inside of her when she first told her grandmother.
A.B. again told Carrie Bowie about Whitehead’s actions after Whitehead moved out of the Bowie home on Windsor Street, but continued to visit there. A.B. stated that she again told her grandmother about Whitehead’s actions “because I wanted him to leave and I didn’t want it to happen to me again.” In addition to her grandmother and her mother, A.B. informed her stepmother, her father, her cousin, and her aunt and uncle about the incidents. During her testimony, A.B. drew on a diagram of a person to indicate what Whitehead’s “private” looked like and where it was located.
Carrie Bowie, who first reported the abuse, testified that A.B. told her that Whitehead had been “messing” with her and “going under her clothes” and “putting his thing in her.” According to Mrs. Bowie, A.B. told her that Whitehead put his penis in her vagina more than one time. Mrs. Bowie stated that she believed A.B. was telling the truth. Mrs. Bowie did not specifically recall calling the police in November 1993, but admitted that she might have confused the dates. UShe testified that A.B. first told her of the incidents after the family moved from the apartment to the house on Windsor Street. Mrs. Bowie admitted telling the police that she did not want the children to live with their mother, but she denied stating that she would not stand for the relationship between Jacqueline Bowie and Whitehead.
*278 Jacqueline Bowie took A.B. to see a doctor in late 1993 after police informed her that Whitehead had been “messing” with A.B. sexually. That physical examination did not show evidence of sexual abuse. Jacqueline Bowie, thus, disbelieved Carrie Bowie’s allegations in 1993 because she knew her mother disapproved of her intimate relationship with her cousin, Whitehead. According to Jacqueline Bowie, A.B. did not personally tell her of the incidents until May or June 1994, when A.B. told her that Whitehead had been touching on her “private part” since they lived in the apartment on North Market Street. Although A.B. did not specifically tell her mother that Whitehead inserted his penis into her vagina, Jacqueline Bowie stated that her daughter said that Whitehead touched her “down there” with his “thing.”
Several of A.B.’s family members testified as to conversations they had with A.B. concerning the incidents with Whitehead. Andre Wilson, A.B.’s father, testified that A.B. reported to him that Whitehead had been “messing” and “playing” with her and he “stuck his private part in [her].” A.B. and her brother moved into Wilson’s home shortly thereafter. According to Wilson, there have been no custody disputes with Jacqueline Bowie since that time.
Diane Wilson, A.B.’s stepmother, stated that A.B. told her a “few” times that Whitehead would feel on her, lick between her legs, stick his finger in her, and put his “private” in her “private.” Mrs. Wilson did not know how many times Whitehead penetrated A.B.
IsA.B.’s uncle, Christopher Castille, who lived with A.B. and her family for a time period, testified that A.B. had told him she had been molested by Whitehead. According to Castille, A.B. told him that Whitehead placed her on his lap and “put his thing to her butt.” Castille further testified that A.B. recounted an incident when Whitehead pulled her pants down and licked her between her legs.
Brian Whitehead, A.B.’s first cousin, also lived with A.B. and her family a short time. After hearing family members talking about the incidents, Brian questioned A.B. According to Brian, A.B. told him that Whitehead waited until her mother went to work and rubbed his “thing” all over her body and between her legs.
Two pediatricians, experts in the area of sexual abuse, corroborated A.B.’s allegations of sexual abuse. Dr. Ed Gustavson examined A.B. on February 17, 1995, after she complained of a vaginal discharge with irritation and discomfort while urinating. Dr. Gustavson testified that A.B. spontaneously began volunteering information about Whitehead during their initial interview. A.B. informed Dr. Gustavson that Whitehead placed his “private” between her legs and she felt something “warm and wet.” Dr. Gustavson opined that A.B. was truthful because of the spontaneity and detail of what she told him. Dr. Gustavson further stated that he saw nothing in his physical examination of A.B. which caused him to disbelieve what she told him.
During his physical examination of A.B., Dr. Gustavson noticed a vaginal discharge which was purulent (containing pus) with a yellowish color. He opined that this discharge was caused by gardnerella vaginalis infection, which he deemed “unusual” for a prepubescent child like A.B. to have. Dr. Gustavson stated that the discharge indicated sexual exposure because the germs causing it must come from inside the vagina, which could not occur if the hymen was intact.
leAccording to Dr. Gustavson, A.B. had an abnormal vagina for a child her age. A.B.’s hymenal opening was almost completely open and her vagina had scars in three separate areas, which the doctor opined were a result of an object being repeatedly moved in and out of the vagina. Additionally, the doctor remarked that the “very clear” scars indicated “quite an impressive penetration, not subtle.”
Although he was unable to determine the exact cause of the scarring, Dr. Gustavson stated that the scars were made by an object the size of a penis. The extent of the damage, together with the location of the scarring, could not have been caused by masturbation or self-exploration, according to Dr. Gustavson. In sum, Dr. Gustavson opined that A.B.’s directness in speaking about the *279 incidents, the infectious vaginal discharge, and the vaginal scarring were definite indicators of sexual abuse.
Dr. Ann Springer, a pediatrician who examined A.B. on May 16, 1995, testified that her findings were consistent with Dr. Gustav-son’s findings of several months earlier. A.B. told Dr. Springer that she was there for the visit because “a man molested me.” Employing a culdoscope, a instrument which contains a magnifying lens and light source described as “very useful in child sexual abuse” cases to examine A.B., Dr. Springer found “a copious discharge, purulent infected looking fluid in the area.” Dr. Springer also noted that A.B.’s hymen was “obliterated” and the opening where it should have been was “irregular and scarred.” Despite being unable to determine when the injury occurred, Doctor Springer opined that it could not have been caused by self-exploration, but was the result of multiple vaginal penetration of violence and force.
Dr. Springer offered several explanations for the November 1993 examination of A.B. which revealed no physical signs of abuse. Dr. Springer explained that a child can be molested and penetrated multiple times without ^exhibiting physical signs of abuse. In addition, Dr. Springer stated that an “inexperienced” physician performed a “naked eye exam” in 1993, without the benefit or the expertise to use the culdoscope.
Moreover, Dr. Springer opined that the November 1993 examination results were “totally consistent with what the child was telling.” According to Dr. Springer, child molesters engage in “grooming” their victims. A typical perpetrator does not begin with inserting an erect penis into a child’s vagina, but rather starts by rubbing the child’s genitals and then moving forward to the inside of the clothing, gradually progressing to actual penetration. Dr. Springer opined that it was certainly possible that the November 1993 examination of A.B. occurred during the early stages of such a “grooming” process.
In his defense, Whitehead testified and presented the testimony of several police officers who had been involved in the matter. Jacqueline B. Willis, a Shreveport police offi-eer who assisted in investigating Carrie Bowie’s allegations of abuse in November 1993, testified that Jacqueline Bowie told officers at that time that A.B. had never complained about an incident of abuse and that Carrie Bowie wanted Whitehead arrested because she was not happy with the incestuous relationship between Whitehead and her daughter. Officer Willis further said that Carrie Bowie told her the incident occurred on November 25, 1993, but A.B., after initially agreeing on the 25th of November, stated that the incident occurred about six months earlier. Officer Willis also stated that Carrie Bowie declared that she did not want the children living in the house with their mother in an incestuous relationship, and she would not stand for that type of relationship.
Detective Carolyn Eaves, an investigator with the Shreveport Police Department assigned to A.B.’s case in January 1995, testified that A.B. and her mother failed to keep a scheduled appointment for an interview in the detective’s | «office. After making several attempts to reschedule an appointment, Detective Eaves closed the case.
Shreveport Police Detective J.B. Walker of the juvenile division testified that he intended to arrest Whitehead, but then changed his mind after interviewing him. Detective Walker stated that Whitehead’s story remained entirely consistent during two separate interviews, emphatically denying all of A.B.’s allegations.
Whitehead testified that he lived with A.B.’s family from September or October 1992 to July 1994, acknowledging that he and Jacqueline Bowie were involved in an incestuous relationship. Whitehead denied ever touching A.B. in any improper manner, specifically denying rubbing on A.B., inside or outside of her clothing, or taking off A.B.’s clothing or putting his penis in A.B.’s vagina.
According to Whitehead, he moved from A.B.’s home in July 1994 after Jacqueline Bowie arranged for a baby sitter for her own children and left his two young children, who were living in the home for the summer, unattended in the house. Whitehead testified that he was also seeing another woman at that time. According to Whitehead, AJB.’s *280 father, Andre Wilson, her grandmother, Carrie Bowie, and her mother, Jacqueline Bowie, were “fighting” over child custody and were trying to put him ‘fin the middle of it.” Whitehead also testified that Carrie Bowie had threatened to kill him and “put him away for good.”

THE ASSIGNMENTS

Whitehead’s first six assignments, being not briefed or argued are considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d-1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied.

Sufficiency of the evidence to convict

In assignments of error seven and eight, Whitehead contends that the trial court erred in denying his motions for a new trial and post verdict judgment of acquittal and/or modification of the judgment, questioning the sufficiency of the ^state’s evidence to convict. The standard of review of the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. La.C.Cr.P. art. 821; Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied.
We review the denial of a motion for a new trial only for errors of law. La. C.Cr.P. art. 858; State v. Wilson, 27,889 (La.App.2d Cir. 4/8/96), 672 So.2d 448. The decision on the motion rests within the sound discretion of the trial court and the ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951 (La.1982); State v. McLemore, 26,106 (La.App.2d Cir. 6/24/94), 640 So.2d 847, writ denied, cert. denied. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. State v. Matthews, 26,550 (La.App.2d Cir. 12/21/94), 649 So.2d 1022, writ denied. As a general rule, the motion will be denied unless injustice has been done. La.C.Cr.P. art. 851; State v. McLemore, supra.
The state must prove, in a prosecution for aggravated rape of a child under twelve years of age, (1) anal or vaginal sexual intercourse, deemed to be without the lawful consent of the victim because of (2) the victim’s age. La. R.S. 14:42(4); State v. Henry, 439 So.2d 1242 (La.App. 5th Cir.1983), affirmed, 449 So.2d 486 (La.1984). We find that a rational trier of fact could have found these essential elements beyond a reasonable doubt. Jackson v. Virginia; Bellamy, supra.
A determination of the weight of the evidence is the province of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27. This court may not second guess the jury’s rational credibility determinations. Jackson v. Virginia, supra; State v. Harris, 94-0970 (La.12/8/94), 647 So.2d 337. In the absence of internal | ipcontradictions or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support the requisite factual conclusion. State v. Combs, 600 So.2d 751(La.App. 2d Cir.1992), writ denied.
When viewed in the light that most favorably supports the jury’s verdict, the testimony presented was legally sufficient to establish the essential elements of the charged crime and convict beyond a reasonable doubt. The jury obviously believed, notwithstanding cross-examination, that AJB. testified convincingly and was generally corroborated by family members and medical evidence. While' Whitehead denied the charges and elicited contradictions from A.B. and her witnesses, it is apparent that the jury chose to believe the testimony of the state’s witnesses. The jury’s credibility determinations will not be disturbed by this court.

Patent error search

By assignment number nine, Whitehead requests this court to review the record for errors patent. This request is unnecessary, as we review for such “patent error” in every criminal case. State v. Shaw, 27,892 (La.App.2d Cir. 4/3/96), 672 ,So.2d 237. We find no errors patent.

*281
DECREE

Whitehead’s conviction is AFFIRMED.