715 So.2d 118 (1998)
STATE of Louisiana, Plaintiff-Appellee,
v.
Frankie L. ADAMS, Defendant-Appellant.
No. 30815-KA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1998.
*119 George Daniel Ross, Monroe, for Defendant-Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen T. Sylvester, Assistant District Attorney, for Plaintiff-Appellee.
Before NORRIS, GASKINS and CARAWAY, JJ.
NORRIS, Judge.
Frankie L. Adams was indicted for the second degree murder of Amos Cyrus, in violation of La. R.S. 14:30.1. He proceeded to jury trial and was found guilty of manslaughter, R.S. 14:31. The District Court sentenced him as a third felony offender to 26.6 years at hard labor. Adams now appeals, urging insufficient evidence to convict as well as various trial errors. For the reasons expressed, we affirm the conviction but amend the judgment for technical corrections.

Factual background
The incident occurred late on Friday and early on Saturday, November 4-5, 1995 on Bonner Street, a "dope track" in the Burg Jones area of Monroe. One witness, named Eddie Modicue, testified about the confrontation. Modicue, who knew both Adams and Cyrus, testified that Cyrus came to Adams's "set" (section of the neighborhood) around midnight to buy drugs. Cyrus paid Adams $30 for some crack, but came back later to complain that the substance was not crack. The two men had words; Adams stepped into his house briefly, then returned and a fight ensued. Adams produced a pipe and landed a blow to Cyrus's head; Cyrus went down immediately. Adams then kicked Cyrus a few times. Modicue commented that Adams was "giving" and Cyrus "receiving"; when it was over, both men walked away.
Cyrus's mother, Ruby Chisley, testified that Cyrus left the house around 9:00 Friday evening; he returned about 1:30 Saturday morning, trying to avoid being seen. By sunup he was immersed in the bathtub, complaining of a headache and a swollen jaw. He would not tell his mother he had been fighting. The next morning he collapsed unconscious on the bathroom floor. Family members rushed him to E.A. Conway Hospital and reported to the physician on duty, Dr. Twitchell, that he hurt his head in the fall. Dr. Twitchell, however, ran a CAT scan which showed intracranial bleeding in both temporal lobes, a condition more consistent with blunt object trauma than with slip and fall. Cyrus regained consciousness briefly at Conway but did not say how he was injured. Dr. Twitchell transferred him to LSU Medical Center in Shreveport, where he died two days later. The coroner, Dr. Hayne, verified that Cyrus died from blunt trauma to the back of the head. The impact was fairly severe, as Dr. Hayne observed contrecoup injuries to the front of Cyrus's brain.
Modicue testified that he did not report the incident to police because he did not want to get involved; however, some days later he read in the paper that Cyrus had died from injuries sustained when he was jumped by four men. That night, one of Modicue's friends, Terrance Long, told Modicue the police were looking for him (Long) as a suspect in the killing. Modicue came to Cyrus's mother to say it was not Long but Adams who had beat her son.
Detective Hank Smith, who had spoken to Mrs. Chisley at Conway, interviewed Modicue on November 14, 10 days after the incident. *120 Modicue related the details outlined above and Det. Smith obtained an arrest warrant on Adams. Around noon that day Det. Smith executed the warrant at Adams's house. Adams's wife initially told officers he was not home; they eventually found him hiding behind a door in the back bedroom.
At trial Adams offered an alibi defense. Although he was married to another woman, Ms. Gregetta "Tish" Owens testified that Adams had planned to spend that weekend with her. According to this account, Adams picked her up about 10:30 Friday night and they cruised the clubs for a couple of hours. Around 12:30 a.m. they were walking together down South 10th Street (more than a walking distance from Bonner St.). Suddenly, a man dressed in black and with five gold teeth jumped them, demanded Adams's money, and shot him in the leg. Adams hit the ground and the assailant fled. Ms. Owens was adamant that this occurred between 12:30 and 1:00 a.m. She and Adams hitched a ride to E.A. Conway and called Adams's mother to the hospital. The mother, Mrs. Williams, also was adamant that she received a phone call at 1 a.m. and reached the hospital at 1:30. However, a Conway staff physician, Dr. Walton, testified that Adams actually entered the emergency room with a gunshot wound at 4:00 a.m.; hospital documents and a Monroe Police officer verified this time frame. Dr. Walton testified that the wound was not "fresh," but could have been anywhere from three to 48 hours old.
Modicue was aware that Adams had been shot around that time; however, he did not know whether this occurred before or after Cyrus's beating. He insisted that between Adams and Cyrus there was no "pistol play," and denied that Adams had to use a pipe because Cyrus pulled a gun on him.
As noted, the jury returned the responsive verdict of manslaughter by 10-2 vote. Adams was subsequently adjudicated a third felony offender; the District Court imposed the minimum sentence permissible under R.S. 15:529.1 A(1), 26.6 years at hard labor.

Discussion: Sufficiency of the evidence
By his sixth and seventh assignments of error Adams urges the evidence was insufficient to support the conviction of manslaughter. The thrust of the argument is that only one witness, Modicue, linked the defendant to the crime, and Modicue's testimony was so riddled with inconsistencies that no rational juror could accept it. Specifically, Adams cites discrepancies between Modicue's initial statement to Det. Smith and his trial testimony. He also contends that the testimony of his alibi witnesses was "essentially unrefuted."
The Constitutional standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); La.C.Cr.P. art. 821. The Jackson standard, however, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess credibility or re-weigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support the requisite factual finding. State v. Braswell, 605 So.2d 702 (La.App. 2 Cir.1992), and citations therein; State v. Gradick, 29,931 (La.App. 2 Cir. 1/22/97), 687 So.2d 1071. Positive identification by one witness may be sufficient to support the conviction. State v. White, 28,095 (La.App. 2 Cir. 5/8/96), 674 So.2d 1018, writ denied 96-1459 (La.11/15/96), 682 So.2d 760.
When the defendant challenges both the sufficiency of the evidence and one or more trial errors, the reviewing court first reviews sufficiency, as a failure to satisfy the Jackson standard will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bullard, 29,662 (La.App. 2 Cir. 9/24/97), 700 So.2d 1051.
As noted, Adams seeks to discredit the State's chief witness, Modicue, by highlighting alleged inconsistencies in his testimony. *121 For example, Modicue initially described the confrontation as a "normal fight" (no weapons used); later he said Adams hit Cyrus with some object, knocking him to the ground; still later, he testified he "couldn't, wouldn't know" if Adams hit the victim with his fists. Modicue also said that many people were in the area when the scuffle occurred, and he identified two persons with him at the time, Michael Douglas and Cleve Glover; however, Douglas denied seeing anything, and Glover could never be located. According to Detective Smith's initial report, Modicue related that Adams was wearing a coat in which he hid the weapon, and that Adams "had to" use the pipe because of a recent gunshot wound; however, Modicue denied giving these details to Smith. Finally, Adams cites as "telling" Modicue's claim (repeated four times) that he read a newspaper account that four men had beat up Cyrus, whereupon he and three other men promptly went to Cyrus's mother to place the blame on Adams, not on "the four of them as was being alleged in rumours."
Despite the discrepancies, Modicue's testimony was consistent on the major issues. He knew both combatants and positively identified Adams. He never deviated from saying that a drug deal went sour; that Cyrus returned and confronted Adams about selling him counterfeit crack; that after a verbal encounter, Adams went inside, quickly emerged and felled Cyrus with a large object, a pipe or a stick; that Adams also kicked his subdued victim in the face; and that both men walked away from the encounter. Adams has not shown in brief, and we do not perceive, any significant reason to discredit these essential elements of Modicue's evidence. Moreover, the testimony of Drs. Twitchell and Hayne is sufficient to convince a rational juror, beyond a reasonable doubt, that Cyrus's death resulted from a blow intentionally directed to the head, and not from a slip and fall in the bathroom.
Adams also cites as "essentially unrefuted" the testimony of his alibi witnesses, Ms. Owens and her mother, who placed Adams a mile away on South 10th Street, being held up and shot, and then visiting the Conway emergency room, all at the time that Cyrus was being throttled on Bonner Street. However, the defense witnesses' time frame was refuted by a treating physician, a policeman and hospital records; even if the jury chose to believe Ms. Owens's improbable tale, it could reasonably find that Adams was robbed and shot before or after the incident with Cyrus, and still reported to the hospital at 4:00 a.m. See, State v. Green, 27,652 (La.App. 2 Cir. 1/24/96), p. 6, 666 So.2d 1302, at 1306; State v. Brown, 588 So.2d 1317, at 1321 (La. App. 2 Cir.1991), writ denied 592 So.2d 1298 (1992). This evidence does not cast reasonable doubt upon the State's case.
Finally we reject as completely unsubstantiated, on this record, the defense's reference to "rumours" that Modicue and his three friends were the actual assailants, with the implicit suggestion that they framed Adams. Modicue admitted that police were looking for one of his friends, Terrance Long, in connection with the case, but Detective Smith testified that Long was not a suspect. Smith further testified that he found no evidence to suggest that Adams was not the perpetrator. The suggestion of "rumours" is completely without evidentiary basis. These assignments of error lack merit.

Contact with juror
By his first assignment Adams urges the District Court erred in denying his motion for mistrial on grounds that the victim's mother "talked to a juror during the course of the trial." Arguing that prejudice must be presumed from any such contact, State v. Charles, 377 So.2d 344 (La.1979), he contends that only a mistrial, not merely excusing the juror, will preserve his rights.
When no mandatory grounds for mistrial are present, La.C.Cr.P. art. 770, mistrial is discretionary upon a showing that "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." La.C.Cr.P. art. 775. Mistrial is a drastic remedy and proper only when misconduct deprives the defendant of any reasonable expectation of a fair trial. State v. Sepulvado, 359 So.2d 137 (La.1978); State v. Baker, 28,152 (La.App. 2 Cir. 5/8/96), 674 So.2d 1108, writ denied 96-1909 (La.12/6/96), 684 So.2d 925. Whether prejudice *122 has resulted lies in the sound discretion of the District Court. State v. Banks, 96-2227 (La.4/18/97), 692 So.2d 1051.
In a criminal case, any private communication, contact or tampering directly or indirectly with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial. State v. Charles, supra. However, not every contact between a juror and a witness will result in mistrial; prejudice must be established. State v. Day, 414 So.2d 349 (La.1982).
Sometime prior to jury selection, one of the prospective jurors, Ms. Benton, had a brief conversation with Mrs. Chisley, the victim's mother. The defendant's father, Willie Williams, advised the judge that the two women were discussing the facts of the case, including the defendant's refusal to accept a plea bargain. The District Court held a hearing at which four persons testified.
Mr. Williams testified that Mrs. Chisley was talking to the juror by the ladies' room, telling her about the declined plea bargain and saying, "I hope they pick you." The defendant's mother, Mrs. Williams, testified that she saw Mrs. Chisley talking to Ms. Benton in the ladies' room, but she could not hear their conversation. Mrs. Chisley testified that she works with Ms. Benton and recognized her at the courthouse; Ms. Benton asked why she was there, and Mrs. Chisley replied, "For the trial of the guy that killed, apparently beat my son to death." Ms. Benton said she was there for jury duty, but at the time Mrs. Chisley had no notion that Ms. Benton would be selected for Adams's trial. Ms. Benton confirmed that Mrs. Chisley saw her on the second floor of the courthouse and asked why she was there; when Ms. Benton mentioned jury duty, Mrs. Chisley replied, "I'm here for my son's trial." She denied discussing the facts of the case or the plea bargain; she said it was "real quick," and ended with Mrs. Chisley saying, "They might pick you." Ms. Benton denied speaking to any other jurors about this.
The District Court stated that it could discern no prejudice, but out of abundant caution removed Ms. Benton from the jury. The defense moved for mistrial, which the court denied, giving the defense instead several options for filling Ms. Benton's place. The defense agreed to let one alternate juror take her place, but reserved an objection. Adams now contends that he suffered from "general prejudice," that the contact between Mrs. Chisley and Ms. Benton "possibly" tainted the entire jury, and that allowing the alternate to serve undermined his strategic use of peremptory challenges.
Despite defense counsel's argument to the District Court and to this court that Mrs. Chisley related certain facts of the case to Ms. Benton, this was not substantiated by either conversant. It was also not corroborated by the defendant's mother. The talk appears to have been limited to why the two ladieswho both work for the school boardwere present in the court house. This is not the extremely prejudicial contact shown in State v. Charles, supra, or in State v. Cantu, 469 So.2d 1083 (La.App. 2 Cir. 1985). Rather, it was innocuous and did not affect the trial at all. See, State v. Ross, 95 1240 (La.App. 1 Cir. 5/10/96), 674 So.2d 489; State v. Hawkins, 496 So.2d 643 (La.App. 1 Cir.1986), writ denied 500 So.2d 420 (1987).
The District Court did not simply deny the mistrial but dismissed Ms. Benton from the jury and gave Adams several alternatives to correct the perceived prejudice. Counsel elected to replace her with an alternate juror. This is the normal function of alternate jurors. La.C.Cr.P. art. 789 A. While Adams contends his full use of peremptory challenges was compromised, he does not show that he would have used one either on Ms. Benton or on the alternate who replaced her.[1] On this showing the District Court did not abuse its discretion in denying the mistrial.
Finally Adams urges that the communication "possibly" tainted the entire panel. There was no showing to substantiate this and no basis for disturbing the court's ruling. This assignment lacks merit.

*123 Abridgement of cross examination

By his second assignment Adams urges the District Court erred in severely limiting his cross examination of the State's key witness, Modicue, thereby denying the defendant's constitutional right of confrontation. He argues that the court's conduct was not that of a neutral arbiter, was overly protective of the witness and discouraged full cross examination. He concedes that from the outset Modicue was "reluctant and combative" on the stand, as the prosecutor had to have him declared a hostile witness.
On cross, however, Adams complains that Modicue became "agitated, hostile and combative"; when defense counsel tried to impeach him with a prior conviction, the State objected, and the court began a dialogue with Modicue, ultimately telling him that if he felt uncomfortable with a question, he should address the court, not defense counsel. Adams also complains that when Modicue used slang expressions unfamiliar to counsel, the court intervened to explain.[2] Against this backdrop, counsel challenged Modicue's testimony that there were many witnesses to the incident; counsel said, "Your honor, would you ask him to let me ask the questions, please, and shut his mouth while I'm asking a question." The court removed the jury and advised counsel it would not tolerate a counselor "telling the witness to shut their mouth." Adams concedes that counsel's choice of words was poor, but complains that the court did not let him explain that his comment was addressed to the court, not to the witness; when the jury returned, the court admonished them that they had been removed because of something "dissatisfactory to the court." Adams argues that after this, the court interrupted him for "slight or perceived" violations; Modicue had to be frequently instructed to be responsive; he accused defense counsel of putting him on trial, and actually induced counsel to make a comment that drew another admonition and threat of contempt out of the jury's presence.[3] He concludes that the court deprived him of full, fair cross examination, and dissuaded him from taking Modicue on re-cross.
The main and essential purpose of the right of confrontation is to secure for the opponent the opportunity of cross examination. U.S. Const., amend. 6; La. Const. Art. 1, § 16; Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross examination is the principal means of assessing the credibility of a witness and the veracity of his testimony. State v. Hillard, 398 So.2d 1057 (La.1981). The District Court, however, must exercise reasonable control over the mode and order of examination. La. C.E. Art. 611 A; State v. Huff, 27,212 (La.App. 2 Cir. 8/23/95), 660 So.2d 529, writ denied 96-0212 (La.5/1/97), 693 So.2d 754. Thus the scope and extent of cross examination is subject to the court's discretion, and his rulings will not be disturbed absent an abuse of that discretion. State v. Garrison, 400 So.2d 874 (La.1981). Further, without a showing that the court's limitation of cross examination prejudiced the defendant, we will not overturn a conviction. State v. Evans, 27,750 (La.App. 2 Cir. 2/28/96), 669 So.2d 719, writ denied 96-0793 (La.6/28/96), 675 So.2d 1119; State v. Washington, 597 So.2d 1084 (La.App. 2 Cir.1992).
We have closely reviewed Modicue's testimony. It is apparent that he was a difficult witness and antagonistic toward all counsel. On this record the court did not abuse its discretion by seeking to quell open hostility in front of the jury. La. C.E. Art. 611. Despite counsel's repeated efforts, Modicue would not retract his testimony that Adams and Cyrus were arguing about money and Adams hit Cyrus with a pipe; he also would not admit telling Det. Smith certain details that counsel felt were present in the police report. Adams has not shown that additional questioning, or re-cross, would *124 have altered Modicue's adamant position. In short, we perceive no prejudice to the defendant. State v. Evans, supra.
This assignment does not present reversible error.

Jury instructions
By his third and fourth assignments Adams contests special jury charges pertaining to flight and the sufficiency of evidence to prove a dangerous weapon.
Adams argues that the flight instruction[4] was inapplicable because he did not flee the scene of the crime, and his alleged attempt to conceal himself from police 10 days later could be explained by the fact that he was on supervised probation. He also urges that the time between crime and flight should attenuate the inference of guilt; in support he cites State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19. However, the instruction fairly tracks the discussion in State v. Davenport, 445 So.2d 1190 (La.1984), in which officers executing an arrest warrant over one year after the offense found the defendant hiding in a closet. See also, State v. Jackson, 629 So.2d 1374 (La.App. 2 Cir.1993), writ denied 94-0201 (La.5/6/94), 637 So.2d 1046, and State v. Daniels, 614 So.2d 97 (La.App. 2 Cir.), writ denied 619 So.2d 573 (1993), which also found evidence of flight and concealment to be relevant. This assignment lacks merit.
Adams charges the weapon instruction[5] was unnecessary because it merely restated the jury's duty to assess the witnesses' credibility and allowed the jury to overlook other circumstantial evidence; it was inappropriate because the use of a dangerous weapon is not an essential element of the charged offense, R.S. 14:30.1. We find that the jury instruction correctly states the law that a single witness's testimony, if believed by the jury, may prove the use of a dangerous weapon even if the weapon was never recovered. State v. Culverson, 26,874 (La. App. 2 Cir. 4/5/95), 653 So.2d 1261; State v. Marshall, 479 So.2d 598 (La.App. 1 Cir.1985). Moreover, the weapon was relevant to this case because the defense sought to show that Cyrus's head injuries could have resulted from falling in the bathroom or from other sources. The expert witnesses were quite certain that only a blow from a blunt object could produce contrecoup bruises on the front of the victim's brain; thus the credibility of Modicue's testimony regarding a pipe was relevant. This assignment lacks merit.

Jury deliberations
By his fifth assignment Adams urges the District Court erred in denying his motion for new trial on grounds of "illegal and improper" conduct of the jury during deliberations. He also contests the court's refusal to hold a hearing on the motion. The factual background is stated in the court's minute entry and order dated May 30, 1997:
Defendant was tried and found guilty of manslaughter earlier this year. After the verdict was rendered, this Court received a telephone call from the foreperson. During this conversation, the foreperson advised the Court of his "unhappiness" with "what went on in the jury room." From that conversation, this Court learned that the "vote count" was reached and/or was changed while one or more jurors were out of the deliberating room on at least onebut not more than twooccasion(s). Further, this foreperson voiced expressions about the Defendant being convicted simply because he was a suspected "drug dealer."
Counsel argued to the District Court that two of the jurors who had voted not guilty requested a lab report and were waiting while the remaining jurors took a final vote; that one of the jurors swayed the others to *125 vote guilty by calling Adams a drug dealer; and the foreperson and the other acquittal-minded juror were not even in the room when these discussions and the last vote was called. Adams contends that the jury's conduct violated La.C.Cr.P. art. 792, which obligates the foreman to preside over jury deliberations; that there is a possibility that the jury considered extraneous evidence in reaching its verdict; and that these actions denied him a fair jury trial. State v. Graham, 422 So.2d 123 (La.1982).
The denial of a motion for new trial may be reviewed only for errors of law. La. C.Cr.P. art. 858; State v. Robicheaux, 412 So.2d 1313 (La.1982); State v. Whitehead, 29,264 (La.App. 2 Cir. 1/22/97), 711 So.2d 275, writs denied 97-0472 (La.6/30/97), 696 So.2d 1007, 97-0780 (La.9/26/97), 701 So.2d 981. Any decision on the motion for new trial is subject to the District Court's discretion; the merits of the motion must be viewed with caution, in the interest of preserving the finality of judgments. La.C.Cr.P. art. 851; State v. Horne, 28,327 (La.App. 2 Cir. 8/21/96), 679 So.2d 953, writ denied 96-2345 (La.2/21/97), 688 So.2d 521.
The Code of Evidence contains a "jury shield" provision:
Art. 606. Disqualification of juror as witness
* * * * * *
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for their purposes.
This article, adopted as part of the Code of Evidence in 1988, does not alter prior law concerning testimony by jurors, La. R.S. 15:470. State v. Duncan, 563 So.2d 1269 (La.App. 1 Cir.1990). Only well pleaded allegations of prejudicial juror misconduct violating the defendant's constitutional rights will justify an evidentiary hearing at which jurors testify. State v. Graham, supra. Unless the allegations are made with particularity, jurors are not competent to testify. State v. Sanders, 539 So.2d 114 (La.App. 2 Cir.), writ denied 546 So.2d 1212 (1989).
The thrust of Adams's argument is that the jury's conduct may have violated art. 792 as well as the court's instructions to deliberate. However, these allegations do not rise to a constitutional level and do not warrant an evidentiary hearing. State v. Horne, supra. The suggestion that the jury may have considered extraneous evidence is completely unsupported. The jury obviously accepted the theory that Adams was provoked by a disgruntled drug customer and overreacted by beating him with a pipe. The fact that Adams was selling crack was critical to the manslaughter verdict and is in no way extraneous. On this showing the District Court did not err in denying the new trial.

Conclusion
For the reasons expressed, the conviction and sentence are affirmed. The judgment is amended, however, to give Adams credit for time served, La.C.Cr.P. art. 880, and for the District Court to advise him of the time limitations for post conviction relief, La. C.Cr.P. art. 930.8.
CONVICTION AFFIRMED; JUDGMENT AMENDED.
NOTES
[1] The record does show that by the time the alternates were selected, Adams had only one peremptory challenge remaining. R.pp. 152, 154.
[2] Modicue testified that Adams was "kicking it with the fellows." Counsel asked if he meant "kidding," but the court interjected, "having a good time." R.p. 267.
[3] Explaining why he and Terrance Long took their story to Mrs. Chisley, Modicue stated, "You got a house here and a house here. I know you know what's happening." Counsel replied, "Yes, I do." The objectionable quality of counsel's remark is not immediately apparent from the record, yet counsel promptly apologized for it.
[4] This charge provided: "Evidence of an attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt." R.p. 162. The phrasing of the instruction reproduced in appellant's brief does not correspond with the instruction actually given. Br., 13.
[5] This charge provided: "Testimony alone, if produced by a witness found to be credible by the jury, is sufficient to establish the presence of a dangerous weapon." R.p. 161.