448 So.2d 654 (1984)
STATE of Louisiana
v.
Bryan Jerome SHANK.
No. 82-KA-2478.
Supreme Court of Louisiana.
February 27, 1984.
William J. Guste, Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard K. Knapp, Dist. Atty., Eugene Bouquet, Asst. Dist. Atty., for plaintiff-appellee.
Richard P. Ieyoub, Lake Charles, Skipper M. Drost, Sulphur, for defendant-appellant.
CALOGERO, Justice.
The defendant in this case, Bryan Jerome Shank, was indicted by the Calcasieu Parish Grand Jury for the capital offense of first degree murder, a violation of La.R.S. 14:30(1). He pleaded not guilty and not guilty by reason of insanity after counsel had been appointed to represent him. At the sanity hearing, on September 30, 1981, defendant was found competent to stand trial and to assist counsel. He was ultimately convicted as charged and, although exposed to the death penalty, upon the jury's recommendation, sentenced only to life imprisonment. Defense counsel has perfected this appeal, asserting thirty-six assignments of error in ten arguments. Finding none of the arguments meritorious, we affirm defendant's conviction and sentence.[1]
The undisputed facts[2] are as follows. Defendant (AWOL from Fort Polk at the time) met the victim Joseph Michael Keyes, a cab driver, in Lake Charles, Louisiana, early in the day of May 4, 1981. After Keyes and Shank discussed the possibility of defendant's purchasing Keyes' car, the victim agreed to meet Shank and his friend, Greg Hoxie (also AWOL), later in the evening. Keyes and his wife later picked up defendant and Hoxie at the bus station. Toward the end of the evening, the victim's wife was dropped off at home. The victim *655 continued driving his own vehicle with Shank and Hoxie as passengers, ostensibly to find a place for Shank and Hoxie to spend the night. The next morning, the body of Michael Keyes was found north of the city of Lake Charles in a roadside ditch along Topsy Road in Calcasieu Parish. The victim had been stabbed numerous times and his throat had been slashed. The victim's car was later found abandoned in a state park in Oklahoma.
On May 13, 1981, Greg Hoxie, defendant's companion, turned himself in as AWOL from Fort Polk to a uniformed St. Louis, Missouri, police officer. When the officer ran Hoxie's name, date of birth and social security number through the computer at the station, it was learned that Hoxie was indeed AWOL and also wanted for a homicide in Louisiana. Upon being questioned, after advisement of his rights, Hoxie stated that he had been traveling with a buddy whom he had left on the highway before he had met the police officer. The buddy's name was Bryan Shank. Two homicide detectives and Hoxie drove to the point of the highway where Hoxie had left defendant Shank. Hoxie pointed out Shank sitting underneath an overpass. The detectives arrested Shank.
Pursuant to an arrest warrant that had been issued in connection with the Louisiana murder, defendant was returned to Louisiana. He gave a detailed confession and also testified at trial concerning the details of the crime. In his confession, defendant stated that during the trip to the house of Keyes' friend, where Shank and Hoxie might spend the night, the trio found themselves on a road north of Lake Charles. The cab driver stopped in order for Hoxie to relieve himself. While Greg Hoxie was out of the cab, Shank, who was sitting in the back seat behind Keyes, pulled out a knife and slashed the victim's throat. On the witness stand at trial, defendant further stated that he had decided when he went AWOL that he would kill somebody. Shank testified that after he cut Keyes' throat, the victim stared at him. That angered Shank, who did not like people to stare at him, so he then stabbed the victim several times. Defendant further testified that he should have cut the victim's head off completely and taken it with him. Defendant dragged Keyes out of the car and over to a ditch, where he left him. Defendant and Hoxie then traveled, in the victim's car, to Oklahoma, where they abandoned the car, and then hitchhiked to St. Louis, Missouri where they were arrested.
Defense counsel's principle argument, encompassing nineteen assignments of error, is essentially that his client was denied a fair trial because of prejudice toward him by the jury, brought about by defendant's own various actions, demonstrations and outbursts, as well as threats by the defendant toward the jury and in their presence.[3]
*656 Counsel was appointed to represent defendant. Defense counsel entered a plea on defendant's behalf of not guilty and not guilty by reason of insanity. After a sanity hearing, defendant was found to be competent to stand trial and to assist counsel. At that point, defendant informed the trial court that he wanted to defend himself for the asserted reason that he wanted the death penalty. The trial judge granted defendant's request but ordered counsel to remain to assist and advise defendant during the proceedings. Approximately a week later, the prosecutor informed the trial court that the state intended to seek supervisory writs from the trial court ruling allowing defendant to represent himself.
We granted writs on the state's application and summarily reversed the trial court. We held that "defendant's election to represent himself for the purpose of acquiescing in his conviction of a capital offense and in his death sentence cannot be sanctioned as an intelligent choice." State v. Shank, 410 So.2d 232, at 233 (La.1982).
Thereafter, on March 19, 1982, prior to hearing motions, the trial judge explained this Court's ruling to defendant. Through counsel, defendant expressed his disagreement with this Court's decision. Shank then addressed the court himself and again stated that he wanted to defend himself. Upon that request's being denied, defendant began making disruptive outbursts and continued doing so throughout the trial.
According to the minutes of the proceedings, defendant began his outrageous behavior on the first day when pre-trial motions were heard. Defendant requested that he be removed from the courtroom. He also asked to be restrained. At the hearing on the motion for a change of venue and for a continuance, defendant refused to go into the courtroom, and the motions were heard in his absence. During voir dire, defendant was allowed to leave the jury room to go to the bathroom. While in the hallway, defendant shouted, in the presence of prospective jurors, that he was guilty. He also threatened various jurors during voir dire examination and at one point held up a sign that read "I am guilty. I cut head off."
While the indictment was being read, charging defendant with first degree murder, defendant nodded his head as if to assent to the fact that he had been involved. Throughout various stages of the trial, defendant continued his disruptive behavior. Shank apparently stood up at one point and threatened to kill the jury members when he escaped if he was given a life sentence. When a witness was being questioned as to whether the knife found in Shank's belongings was likely the same knife used to stab the victim, Shank answered out loud that it was. He also commenced pounding on the defense table as if stabbing something. Such demonstrations continued throughout much of the trial, culminating with an attack upon defense counsel. As defense counsel was questioning the psychologist from Fort Polk who had treated defendant, Shank jumped across the counsel table, struck counsel, knocked him to the floor and began strangling his attorney before he could be subdued. Shank also insisted upon testifying *657 at trial. When he did so he described the circumstances of the crime in great detail and eventually expressed to the jury his regret over not having entirely cut off and taken with him the head of the victim.
After each demonstration by defendant, counsel made an objection, challenging the juror for cause during the voir dire incidents and then moving for a mistrial during the trial. The trial court overruled defense counsel's objections and denied his mistrial motions. On several occasions the trial court attempted to reason with defendant after the outbursts or demonstrations. The court repeatedly warned Shank that he would be bound and gagged if he continued to disrupt the trial. Shank nonetheless continued his disruptive behavior, until the attack upon defense counsel, at which point the trial judge did order the defendant bound and gagged.
In each instance, it was defendant's own behavior in the presence of the jury which served as the grounds for defense counsel's objections, the denial of which he assigns as error in this appeal.
The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." It has been held that the Fourteenth Amendment makes the guarantees of this clause obligatory upon the States. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Indeed, the same right is embodied in our own Constitution in Section 16 of Article I. One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial. Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892); State v. Ranker, 359 So.2d 129, 130 (La.1978). Thus, the question presented in this case is whether an accused can claim the benefit of this constitutional right to remain in the courtroom while at the same time claiming (personally or through counsel) reversible error based on the prejudicial impact on the jury of his own speech and conduct. We think not.
While it is true that one's Confrontation rights are not absolute, Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), it is likewise true that courts must indulge every reasonable presumption against the loss of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The trial judge here was faced with strong constitutional mandates not to remove the defendant from the courtroom; nor to bind and gag him in the presence of the jury. Illinois v. Allen, supra. The trial judge stated in his reasons for denying counsel's mistrial motions that he had desisted from such actions because of a concern for the protection of defendant's confrontation rights. He also stated that it would, for the most part, be useless, since the defendant was insisting on taking the stand and testifying, at that time having the opportunity to make the admissions of his guilt that he was blurting out during the trial. The trial judge exhibited commendable patience in attempting to preserve defendant's constitutional rights. Yet the defendant continued to blurt out disruptive remarks in the jury's presence and at times even directly to certain jury members.
Now defense counsel argues that his client's conviction and sentence should be set aside because of the prejudicial impact on the jury caused by his client's own conduct. It is obvious that to afford a defendant such relief, based on his own conduct, is to give him a tool by which he can effectively prevent forever a final determination of his guilt. Such a result cannot be tolerated if our system of justice is to survive. This was pointed out almost one hundred years ago, Falk v. United States, 15 App.D.C. 446 (1899), and has since been consistently reaffirmed. Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); Illinois v. Allen, supra, Justice Brennan concurring.
In Falk, the Court said:
It does not seem to us to be consonant with the dictates of common sense that *658 an accused person ... should be at liberty, whenever he pleased, ... to break up a trial already commenced. The practical result of such a proposition, if allowed to be law, would be to prevent any trial whatever until the accused person himself should be pleased to permit it.... This would be a travesty of justice which could not be tolerated.... [W]e do not think that any rule of law or constitutional principle leads us to any conclusion that would be so disastrous as well to the administration of justice as to the true interests of civil liberty.
* * * * * *
The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty. Neither criminal nor in civil cases will the law allow a person to take advantage of his own wrong.
And, after citing the above language from Falk with approval, Justice Brennan concurring in Illinois v. Allen, supra, added:
To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very process that the Constitution prescribes.
Our own state courts have taken a similar approach to the question of whether a defendant's own disruptive behavior requires a mistrial or new trial because of the prejudice the conduct may have caused in the minds of the jurors. In State v. Wiggins, 337 So.2d 1172, at 1173 (La.1976), Justice Tate, speaking for the Court stated:
The motions for mistrial were properly denied. State v. Washington, 322 So.2d 185 (La.1975). A defendant cannot complain that prejudicial conduct requires a mistrial, when the alleged prejudice was created by his own obstructive conduct met by a reasoned and ordered reaction by the trial court in the interest of maintaining orderly procedure in the courtroom.
Thus we have a jurisprudential history on both the state and federal levels which strikes the balance between ordered liberty or social peace, and personal rights, with recognition of the fact that in order to maintain the former the constitutional power to bring an accused to trial must prevail. The personal safeguards that the Constitution affords criminal defendants presupposes that sovereign prerogative. Accordingly, we cannot agree with defense counsel that defendant is entitled to a new trial because his first was tainted with prejudice caused by his own conduct.
Furthermore, we are not so sure that the record clearly supports a showing of the prejudice referred to by defense counsel. Defendant was on trial for first degree murder. He faced the possibility of the jury's recommending that he be sentenced to death. He threatened the jury that if only sentenced to life imprisonment he would have the rest of his life to escape, and that if he did so he would kill each one of them. Notwithstanding these threats, which defense counsel argues prejudiced the jury against him, the jury did not return the recommendation that defendant be executed. Instead, the life imprisonment sentence was recommended. Thus the prejudice in the jurors' minds, that defense counsel argues tainted his client's trial with reversible error, does not readily appear.
Additionally, from a review of the record before us, the Court is not entirely convinced that defendant's outbursts were for his espoused reason, i.e., that he wanted the jury to return a guilty verdict and recommend the death sentence. It may well have been that defendant, who from the outset was insistent on representing himself, simply made a tactical decision as to how best to proceed. Defendant pleaded *659 not guilty and not guilty by reason of insanity. It seems that defendant's outbursts may have been motivated by a belief that he could convince the jury that he was insane, thus securing the latter verdict, or alternatively that he could convince the jury to spare his life. It did not go unnoticed that defendant's outbursts seemed quite timely and pointed.
Defense counsel argues that defendant should not have been permitted to take the stand and testify where the trial judge knew the nature of the testimony that defendant intended to give. He argues that it was reversible error for the trial judge to allow defendant to do so. The state responds that it was not reversible error since every person charged with a crime has the right, if he chooses, to take the stand and testify in his own defense. Defense counsel argues that, to the judge's knowledge, defendant's testimony was not going to be in his own defense.
Again, this is a judgment that the Court is not prepared to make on this record. Defendant's testimony of bizzare details of the crime, including his admission that his only regret was that he did not cut the victim's head completely off and take it with him, could well have been presented in an attempt to have the jury reach a verdict that the defendant was not guilty by reason of insanity, or at least spare his life. Thus, defendant's testimony may well have been "in his own defense" as he saw it. After all, as pointed out above, defendant did succeed in avoiding the death penalty.
If there is to be any workable system of social order, one charged with a crime must in due course be brought before the court, tried for his offense, and punished if found guilty. One charged with a crime cannot be permitted to subvert the ends of justice by his own intentional conduct. Consequently, for the above reasons, we find no merit in defendant's arguments on appeal.

Decree
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Only one of defendant's arguments is addressed in the main text of the opinion. The other assignments, being governed by clearly established principles of law and only of interest to the defendant, are discussed in an unpublished appendix to this opinion.
[2] The facts have been reconstructed from the testimony of Marlene Keyes, the victim's wife, defendant's testimony, and the factual synopsis in the state's brief, taken from defendant's taped confession. The record consists only of transcript excerpts in this case.
[3] More specifically, defendant's assignments of error in this regard are as follows: Assignment of error no. 8 relates to defendant's laughing and raising victory signs to the prospective jurors as the trial judge was reading the indictment charging defendant with first degree murder. Defendant also nodded his head as if to assent to the fact that he had been involved. Assignment of error no. 13 relates to defendant's threats against defense counsel and their families during voir dire which was subsequently reported in the newspaper and on a TV news cast. Assignments of error nos. 17 and 19 involve defendant's improper hand gesture toward a juror and the entire venire. Assignment of error no. 20 relates to defendant's laughing audibly in front of jurors. Assignment of error no. 21 involves Shank's behavior in the hall when he was allowed to leave the jury room to go to the bathroom. Once outside, he screamed out, "I'm guilty" in a loud voice that was heard by those in the jury room as well as prospective jurors standing in the hall. Assignment of error no. 26 relates to defendant's holding up hand printed signs that read "I am guilty. I cut head off," and "when I escape, I'll kill jury" when three prospective jurors were present in the jury box. Assignment of error no. 27 involves defendant's repeated disrupting comments to a prospective juror during voir dire.

Assignment of error no. 32 relates to threats made by defendant to the jury during the trial. Shank evidently stood up, hollered an obscenity and threatened to kill the jury when he escaped since he had his whole life in which to accomplish the killing. Assignment of error no. 33 involves defendant's motions toward the jury and verbal threats. During trial when a doctor was testifying as to whether the knife being discussed was the same weapon used in the crime, defendant answered that it was the same knife. Shank began hitting the desk in front of him as if stabbing somebody; he also threatened the jury that he would cut them up in little pieces and that they were all going to be castrated. Assignment of error no. 35 relates to defendant's physical attack upon defense counsel while counsel was questioning the psychologist from Fort Polk who had previously treated defendant. Shank jumped across the counsel table, struck counsel, knocked him to the floor and began choking his attorney before he could be subdued.
Assignments of error nos. 12, 15, 18, 22, 23, 25, and 28 relate to the trial court's denial of defense counsel's challenges for cause of prospective jurors who witnessed or were exposed to one or more of Shank's demonstrations discussed above as bases for defendant's motions for mistrial.
Assignment of error no. 34 presents the argument that the trial court committed reversible error by allowing defendant to take the stand at trial and testify, when the court knew that defendant intended to admit his guilt and give other prejudicial testimony concerning the circumstances of the crime.