776 So.2d 1188 (2000)
STATE of Louisiana
v.
Wesley Lee CALHOUN.
No. 00-614.
Court of Appeal of Louisiana, Third Circuit.
November 2, 2000.
*1190 Thomas Walsh, Jr., Assistant District Attorney, Alexandria, LA, Counsel for the State.
Katharine Geary, Alexandria, LA, Counsel for Defendant.
(Court composed of BILLIE COLOMBARO WOODARD, MARC T. AMY, and MICHAEL G. SULLIVAN, Judges.)
SULLIVAN, Judge.
Defendant, Wesley Lee Calhoun, was convicted of one count of aggravated burglary, a violation of La.R.S. 14:60. The State filed a habitual offender bill, and after a hearing, Defendant was found to be a fourth felony offender. The trial court subsequently sentenced Defendant to serve forty years at hard labor without the benefit of parole, probation, or suspension of sentence. The State filed a motion to reconsider the sentence, which the trial court denied after a hearing. Both the State and Defendant have appealed.

Facts
On February 17, 1997, the victim, Rhonda Dorsey, was visiting with a friend, Samuel Blue, at her mother's home, where she had been staying after she broke off a relationship with Defendant. Shortly after midnight, Defendant kicked open the front door and entered the house, wielding a large board. Mr. Blue heard Defendant say, "Uh-huh, bitch, I caught you." As Defendant began swinging the board, Mr. Blue "got him from the back," and the two men fought briefly on the floor. Mr. Blue told the victim to leave the house, but instead, she began beating on another door while calling for her mother. As Mr. Blue left the house, he could hear the victim screaming, but he did not see Defendant strike her.
The victim's mother, Gail Barfield, responded to her daughter's screams by coming through the front door. She saw Defendant running out of a side door and saw the victim on the floor, with blood all over her, on the couch, and on the floor. Because the victim was first hit from behind, she testified that she did not see who inflicted the blow. Although she remembered only one blow, she ultimately suffered injuries requiring forty-four stitches on one side of her head and staples on the other. According to the victim, Defendant was not authorized to enter her mother's home that night.

Sufficiency of the Evidence
In his fifth assignment of error, Defendant argues that the evidence was insufficient to support a conviction for aggravated burglary. Specifically, Defendant argues that the State did not produce the dangerous weapon allegedly used in the crime and that no witness identified him as the person who struck the victim. In accordance with State v. Hearold, 603 So.2d 731 (La.1992), we will consider this assignment of error first.
La.R.S. 14:60 defines "Aggravated burglary" as follows:

*1191 Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.

Dangerous Weapon
Officer Mikel White of the Lecompte Police Department testified that when he arrived at the scene, he saw the victim sitting on the floor, badly battered and bleeding profusely from her head. Officer White testified that he retrieved a board at the house that he believed was used in the attack. At trial, Officer White identified State's Exhibit Number Eleven as the board he found at the scene. However, both Mr. Blue and the victim testified that the board they saw Defendant with was larger than Exhibit Eleven. The victim's mother, who did not arrive until after her daughter was beaten, testified that she did not see anything in Defendant's hands as he ran out of the side door.
In State v. Rash, 444 So.2d 1204 (La.1984), a defendant accused of armed robbery argued that the State failed to prove he was armed with a dangerous weapon because it did not introduce the revolver used in the crime. However, the victims testified that they saw a gun handle sticking out of the defendant's pants and that the defendant offered to sell them a .38 caliber revolver. The supreme court concluded that the jury could have found the defendant was armed with a dangerous weapon based upon this testimony. Likewise, in the present case, the testimony of both the victim and Mr. Blue that Defendant was wielding a large board as he kicked open the door of the house supports the jury's finding that Defendant was armed with a dangerous weapon.

Battery
Although the victim identified Defendant as the person who kicked open the front door, she explained that she was running away with her face turned in the other direction, so she did not see who struck her from behind. Mr. Blue also identified Defendant as the man who was swinging a board as he came through the door, but he did not see Defendant strike the victim before he left the house. The victim's mother only saw Defendant running out of the side door. Significantly, no witness testified that anyone else was present at the scene.
Although the State presented a strong circumstantial case that Defendant did strike the victim, we note that the battery of a person is not the only circumstance that will support a conviction for aggravated burglary. Under La.R.S. 14:60(1), the crime is complete upon an unauthorized entry, with the intention to commit a felony or any theft therein, if the offender is armed with a dangerous weapon. If these three elements are present, the circumstance of paragraph (3) is not required for a conviction.
In the present case, the State presented evidence of positive identity, unauthorized entry, specific intent to commit a felony, and the use of a dangerous weapon. Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the elements of aggravated burglary proved beyond a reasonable doubt.

Right to Counsel of Choice
In his first assignment of error, Defendant argues that the trial court should have granted a continuance or at least conducted a hearing when he indicated that he wanted to hire retained counsel because his appointed counsel was unprepared for trial.
*1192 On the day of trial, Defendant informed the trial court that he wanted to hire his own lawyer because he had not seen his appointed attorney in twenty-five months.[1] He claimed that although he had called his attorney three hundred times, he had seen him only once and he had not discussed his case with him.
The trial court replied that Defendant's request came too late, noting that several "pretrials" were conducted in the case and that motions and answers for discovery had been timely filed. When the trial court asked Defendant if he had made any effort in the past two years to hire his own lawyer, Defendant stated that he had talked about it many times and that his sister may have contacted other attorneys about taking his case. The trial court ultimately found Defendant's request was not timely because his family had two years to hire another attorney.
In State v. Leggett, 363 So.2d 434, 436 (La.1978) (citations omitted), the supreme court stated:
Both the federal and state constitutions provide that the accused has the right to counsel of his own choosing to defend him on a criminal charge. However, this right does not permit arbitrary action which obstructs orderly procedures in the courts. Rather the right to choose one's attorney is a right to be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system. There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications to the orderly trial of cases. Once the trial day has arrived, the question of withdrawal of counsel rests largely within the discretion of the trial judge. This court has frequently upheld the trial court's denial of motions for continuances or withdrawal of counsel made on the day of trial when defendant is dissatisfied with his present attorney but had ample opportunity to retain private counsel.
In the present case, the crime occurred on February 17, 1997, and the bill of information was filed on March 13, 1997. Trial was originally set for September 15, 1997, but was continued to October 13, 1997 and then to October 14, 1997. Defendant then requested the appointment of a sanity commission. Defendant was evaluated and after a contradictory hearing was found competent to stand trial on February 12, 1999. The trial was continued until February 19, 1999, and then to May 4, 1999 pursuant to a joint motion. Over two years had elapsed between the filing of the bill of information and the first day of trial. Thus, Defendant and his family had a considerable amount of time to secure the services of a private attorney.
Additionally, the record indicates that Defendant caused quite a disruption in the courtroom when he refused to proceed to trial. However, during his many exchanges with the trial court, Defendant did not make any specific allegations regarding counsel's preparedness, other than counsel had not subpoenaed any witnesses. Defendant did not state what witnesses he believed were necessary for his defense. The trial court reviewed the record, finding that timely motions had been filed, that he had talked to defense counsel about the case, and that several pretrials had been conducted. On this record, we find that the trial court did not err in failing to grant a continuance or to conduct a hearing on counsel's preparedness.

Challenges for Cause
In his second assignment of error, Defendant argues that the trial court should have granted his challenges for *1193 cause as to those prospective jurors who were in the courtroom during his outburst when the trial court ordered him to proceed to trial with his appointed attorney. The record reveals that the trial court ordered six bailiffs to forcibly remove Defendant after a lengthy outburst in which Defendant repeatedly screamed that he was being "railroaded" into standing trial. Defendant argues that his restraint by six law enforcement officers created the impression that he is not a law-abiding citizen.
From a comment made by defense counsel, it appears that prospective jurors Viola Hill, Danny Jeansonne, John Paul, Christine King, and Joyce Hawkins were in the courtroom during Defendant's outburst. A sixth prospective juror who may have been present was Vergie Clark. During voir dire, Ms. Hill, Mr. Paul, and Ms. King all stated that they could be fair, despite witnessing Defendant's outburst. The record does not reveal that the defense questioned Ms. Hawkins or Mr. Jeansonne about the incident. After the trial court denied Defendant's challenges for cause as to these prospective jurors, Defendant used peremptory challenges to excuse Ms. Hill, Mr. Jeansonne, Ms. King, and Ms. Hawkins. The State excused Mr. Paul, and the trial court excused Ms. Clark, possibly for medical reasons. The index of jury selection indicates that Defendant eventually exercised all of his peremptory challenges.
In State v. Shank, 448 So.2d 654 (La. 1984), the defendant argued that he was denied a fair trial because his outbursts and threats toward the jurors prejudiced them against him. In a footnote, the court listed the actual assignments of error raised by defense counsel, seven of which dealt with the denial of challenges for cause as to jurors who witnessed or were exposed to the defendant's demonstrations.
In Shank, the defendant embarked upon a disruptive course of conduct after the trial court denied his request to represent himself because he wanted to receive the death penalty. During voir dire, the defendant held up a sign that said, "I am guilty. I cut head off." At one point during the trial, the defendant stood up and threatened to kill the jurors when he escaped if he was given a life sentence. During the questioning of his treating psychologist, he jumped across the counsel table and began strangling his attorney. After several warnings, the trial court ordered the defendant bound and gagged.
The supreme court phrased the issue in Shank as "whether an accused can claim the benefit of this constitutional right to remain in the courtroom while at the same time claiming (personally or through counsel) reversible error based on the prejudicial impact on the jury of his own speech and conduct." Id. at 657. The supreme court set forth the following discussion before concluding that the defendant's conviction should be affirmed:
Now defense counsel argues that his client's conviction and sentence should be set aside because of the prejudicial impact on the jury caused by his client's own conduct. It is obvious that to afford a defendant such relief, based on his own conduct, is to give him a tool by which he can effectively prevent forever a final determination of his guilt. Such a result cannot be tolerated if our system of justice is to survive. This was pointed out almost one hundred years ago, Falk v. United States, 15 App.D.C. 446 (1899), and has since been consistently reaffirmed. Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); Illinois v. Allen[, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)], supra, Justice Brennan concurring.
. . . .
Our own state courts have taken a similar approach to the question of whether a defendant's own disruptive behavior requires a mistrial or new trial because of the prejudice the conduct may have caused in the minds of the jurors. In State v. Wiggins, 337 So.2d *1194 1172, 1173 (La.1976), Justice Tate, speaking for the Court stated:
The motions for mistrial were properly denied. State v. Washington, 322 So.2d 185 (La.1975). A defendant cannot complain that prejudicial conduct requires a mistrial, when the alleged prejudice was created by his own obstructive conduct met by a reasoned and ordered reaction by the trial court in the interest of maintaining orderly procedure in the courtroom.
Id. at 657-58.
In finding no merit to the defendant's arguments, the supreme court stated that "[o]ne charged with a crime cannot be permitted to subvert the ends of justice by his own intentional conduct." Id. at 659.
We find that the trial court did not abuse its discretion in denying the challenges for cause as to the five jurors present during Defendant's outburst. Three of the five jurors stated that they could be fair, and for some reason, defense counsel chose not to question the other two regarding their ability to be impartial after witnessing the outburst. Defendant was ultimately responsible for his actions, and he should not be allowed to benefit from his intentional disruption.

Mistrial
In his third assignment of error, Defendant contends the trial court should have granted his request for a mistrial after two prospective jurors indicated that a person claiming to be related to Defendant told them and others nearby that Defendant was a "pretty bad dude" who had committed other crimes. Although the two prospective jurors who reported the incident were excused for cause, Defendant argues that a mistrial should have been granted because the record does not negate the possibility that other prospective jurors heard these remarks.
The record reveals that the trial court divided the entire venire into three separate panels. During voir dire of the second panel, the prosecutor asked if anyone had been contacted by either the victim's or Defendant's families. Prospective jurors Frank Bell and Curtis Piper indicated they had "heard some talk" the previous day. The trial court later questioned Mr. Bell and Mr. Piper outside the presence of the other panel members about what they had heard.
Mr. Bell testified that as he was leaving the previous day one of the dismissed jurors told him and Mr. Piper that Defendant was involved in another incident in which he "jumped on somebody" after "he broke into a place." Mr. Piper stated that Defendant's cousin, who had been excused the previous day, told them he was present when Defendant hit a woman in the head and that he was scared of Defendant because he was a "pretty bad dude." According to Mr. Piper, a lady standing nearby said, "I wouldn't want to meet him at night then." Mr. Piper also said that the man was talking loudly and that there were about six to eight people around. Mr. Bell and Mr. Piper were excused for cause.
At the close of jury selection, defense counsel moved for a mistrial pursuant to La.Code Crim.P. art. 775, but his request was denied. The trial court noted that it had asked the last panel of prospective jurors if they had heard anything in the courthouse concerning the case and no one indicated that they had. On appeal, Defendant argues that the jurors selected from the first panel were not asked whether they had heard anything in the courthouse about the case or more specifically, whether they had heard anything from a relative of Defendant
The index of jury selection indicates that the only members of the first panel who served on the jury were Hilda Dixon and Phyllis Sherman. While questioning the first panel, defense counsel asked, "Any of y'all heard any pretrial publicity about this case? Nobody? Okay." After presiding over the challenging process, the trial court told the accepted jurors to return *1195 the next day at 10:30 a.m. Before releasing this panel, the trial court instructed them to report if anyone spoke to them about the case. The trial court then had the bailiff call the names of thirty more jurors. The questioning of this second panel did not begin until the following day.
During voir dire of the second panel, the trial court asked the prospective jurors if any of them knew the victim or if they had heard anything about the incident. There was no show of hands. However, later, when the prosecutor asked the second panel if anyone had been contacted by either the victim's or the Defendant's family, Mr. Bell and Mr. Piper indicated that they had heard "some talk" the day before.
The jurors selected from the second panel were kept in the courtroom as the jurors chosen from the previous day returned. At that point, the State excused one juror from the first panel. The remaining jurors were then released until 2:30 p.m., after being instructed to report if they heard anyone talking about the case. A third panel of prospective jurors was then called into the courtroom. When the trial court asked if any of them had heard anything about the case, no one indicated they had. After general questioning, the attorneys exercised their challenges, and the jurors selected from the third panel were sworn. Shortly thereafter, the clerk administered the oath to the entire panel.
From this record, it is clear that the trial court twice instructed the jurors from the first panel to report if anyone talked to them about the case. The record does not indicate that anyone approached the trial court to report that they had been contacted.
In discussing the effect of improper contact with jurors, the court in State v. Adams, 30,815, pp. 6-7 (La.App. 2 Cir. 6/24/98); 715 So.2d 118, 121-22, writ denied, 98-2031 (La.3/19/99); 739 So.2d 774, stated:
When no mandatory grounds for mistrial are present, La.C.Cr.P. art. 770, mistrial is discretionary upon a showing that "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." La.C.Cr.P. art. 775. Mistrial is a drastic remedy and proper only when misconduct deprives the defendant of any reasonable expectation of a fair trial. State v. Sepulvado, 359 So.2d 137 (La.1978); State v. Baker, 28,152 (La.App. 2 Cir. 5/8/96), 674 So.2d 1108, writ denied 96-1909 (La.12/6/96), 684 So.2d 925. Whether prejudice has resulted lies in the sound discretion of the District Court. State v. Banks, 96-2227 (La.4/18/97), 692 So.2d 1051.
In a criminal case, any private communication, contact or tampering directly or indirectly with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial. State v. Charles, [377 So.2d 344 (La.1979) ]. However, not every contact between a juror and a witness will result in mistrial; prejudice must be established. State v. Day, 414 So.2d 349 (La. 1982).
In Adams, a prospective juror in a murder trial had a conversation with a coworker, who happened to be the victim's mother. At the time of the conversation, neither woman was aware of the other's relationship to the case, and the prospective juror testified that they did not discuss the facts of the case. The prospective juror also denied speaking to other panel members about the conversation. The trial court found that the conversation was not prejudicial, but as a precautionary measure, it excused that prospective juror. On appeal, the second circuit rejected the defendant's argument that a mistrial was warranted because the contact possibly tainted the entire jury.
In State v. Charles, 377 So.2d 344 (La. 1979), the supreme court held the trial court erred in refusing to hold an evidentiary hearing concerning threats made to *1196 the jury during the trial. Near the end of trial, the trial court informed the attorneys that certain members of the jury had been threatened, but it provided no further information. Defense counsel later raised the threats to the jury as grounds for a new trial or at least an evidentiary hearing. In finding error in the trial court's denial of the defense motion, the supreme court stated that any contact, tampering, or private conversation with a juror during a case is presumptively prejudicial. Because the record did not establish if the threats were in fact prejudicial, the supreme court ordered the trial court to hold an evidentiary hearing "to determine the nature of the threats to the jury, which jurors were threatened and whether the entire jury knew of the threats." Id. at 346.
In State v. Cantu, 469 So.2d 1083 (La. App. 2 Cir.1985), the daughter of a juror told her mother of the defendant, "Mama, you know he's guilty, he's wanted." Id. at 1085. The juror then told other members of the panel that she would like to know more about "this fellow" because she heard he was wanted in another state. In reversing the defendant's conviction, the second circuit found that the State did not overcome the presumption of prejudice because extraneous information about the defendant's criminal history, which had previously been held inadmissible, was communicated to other jurors prior to deliberations.
In the present case, the comments made by the dismissed juror did involve the matter pending before the court. However, the trial court excused the two prospective jurors who reported the incident, and it instructed the other jurors to report any conversations about the case. No other juror came forward. Defendant's argument is based on the assumption that some of the remaining jurors overheard the conversation reported by Mr. Bell and Mr. Piper. However, we cannot conclude that the record supports this assumption. We, therefore, find no error in the denial of the motion for mistrial.

Admonition
In his fourth assignment of error, Defendant argues that he was entitled to an admonition explaining that he should not be held responsible for the problem of domestic violence. During the State's opening statement, the prosecutor stated, "It's a short case. Unfortunately it's one that we've seen many times, I guess, in this state of affairs that we have; domestic violence. And I want you to punish him for what anybody else does to anybody else." At this point defense counsel requested a bench conference, but it was not transcribed. After the jury retired to deliberate, defense counsel reurged his objection, noting that the trial court had denied his request for an admonition under La.Code Crim.P. art. 771. The trial court then expressed its belief that an admonition would have only reinforced the statement. On appeal, Defendant argues that the prosecutor's remark was outside the scope of opening statements in violation of La.Code Crim.P. art. 766.
La.Code Crim.P. art. 766 provides:
The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.
La.Code Crim.P. art. 771 provides in part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, *1197 or a court official, and the remark is not within the scope of Article 770;....
In State v. Crocker, 551 So.2d 707 (La. App. 1 Cir.1989), the prosecutor referred to the drug charges against the defendants as "so malignant in their affect (sic) and so devastating and so far reaching that we cannot afford to ignore these kind of acts because the State of Louisiana may not survive...." Id. at 712. The trial court overruled defense objections during the opening statement, but instructed the prosecutor to "[p]roceed to the factual evidence." Id. The appellate court concluded that although the prosecutor strayed from the scope of opening statements, the defense timely objected and the trial court's admonition to the prosecutor prevented any prejudice. In a footnote, the court noted that because the defendants did not request an admonition or a mistrial when the comments were made, they could not raise the error on appeal.
In State v. Bonanno, 373 So.2d 1284 (La.1979), the defendants sought a mistrial when the State told the jury during closing arguments that there had been twenty-six recent indictments for distribution of drugs. The supreme court determined that this was improper argument, as the information did not relate to the evidence or the guilt or innocence of the defendants. Since La.Code Crim.P. art. 774 governing the scope of closing argument does not provide a sanction for its violations, the supreme court concluded that the trial court's ruling would be error only if a mistrial were mandated by La. Code Crim.P. arts. 770, 771 and 775. The supreme court found that the comments did not warrant a mistrial and that the trial court's admonition to the jury not to consider any references to the indictments was sufficient.
In State v. Melton, 456 So.2d 192 (La. App. 4 Cir.1984), the prosecutor in closing arguments stated that the defendant had a motive for the crime because he was a junkie who sold auto parts to pay for drugs. He further stated that "all of ya'll are aware of the crime problem in this City." Id. at 196. The defense moved for a mistrial at this point, but the request was denied. On appeal, the fourth circuit found the remark about crime in the city was improper because it was without evidentiary foundation; however, the court also found the trial court's admonition to disregard the comment sufficient to "neutralize any harmful effect." Id.
In this case, the record does not indicate what action was taken during the bench conference. Obviously, defense counsel's request for an admonition was denied, but it is not clear if the trial court instructed the prosecutor to proceed only with the facts, as was done in Crocker. Although Melton and Bonanno do not state that an admonition is mandated in this situation, those cases indicate that admonition would have sufficiently alleviated any harm. While we agree that the prosecutor's comments warranted admonition in this case, we find the error harmless when considered in light of all the evidence presented.

Sentence
In his final assignment of error, Defendant contends that his forty-year sentence as a fourth felony offender is excessive because the trial court did not properly weigh his non-violent history. The State has also appealed Defendant's sentence, arguing that it is illegal because it deviates from the mandatory minimum of life imprisonment, as required by La.R.S. 15:529.1, and because the trial court did not articulate a sufficient factual basis for sentencing Defendant below the statutory minimum.
La.R.S. 15:529.1(A)(1)(c)(ii) states:
If the fourth or subsequent felony or any of the prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or of any other crime *1198 punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
At the initial sentencing hearing, the State introduced evidence of the following prior felonies: forgery in 1984; simple burglary in 1988; theft in 1988; simple burglary in 1992; and theft in 1995. The instant offense, aggravated burglary, is defined as a crime of violence by La.R.S. 14:2(13)(v). Thus, the mandatory minimum sentence for Defendant's crime was life imprisonment.
The State also introduced a presentence investigation report that revealed misdemeanor convictions of simple battery in 1984 and 1985, as well as several other arrests with no disposition of the charges. The report also indicated that Defendant's parole or probation had been revoked six times. According to the "Victim/Complainant Statement" of the report, Defendant subsequently threatened the present victim and her ten-year-old daughter.
Defendant spoke at the hearing, apologizing for his conduct at trial and asking the trial court to consider that the instant crime was fueled by emotions. Defendant also produced many letters of support from the community, including one from the office of the mayor of Lecompte. In imposing a sentence below the statutory minimum, the trial court acknowledged the contents of the presentence investigation report, but stated, "I just have a philosophical problem of life without benefit ... of probation, parole or suspension, when there is a series of ... thefts and property crimes." The trial court then imposed the sentence of forty years with the Department of Public Safety and Corrections without probation, parole, or suspension of sentence.
At the hearing on the State's motion to reconsider, the trial court heard testimony from law enforcement and probation officers who recounted various threats that Defendant had made to them or to their co-workers. At the close of evidence, the trial court expressed its belief that the habitual offender statute would not require a life sentence because the instant offense was one of "jealous rage and reaction."
In State v. Johnson, 97-1906, pp. 6-8 (La.3/4/98); 709 So.2d 672, 674-77 (emphasis added), the supreme court addressed the circumstances under which State v. Dorthey, 623 So.2d 1276 (La.1993), would permit a downward deviation from a statutorily-mandated sentence:
In State v. Dorthey, supra, this Court held that a trial court must reduce a defendant's sentence to one not constitutionally excessive if the trial court finds that the sentence mandated by the Habitual Offender Law "makes no measurable contribution to acceptable goals of punishment", or is nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime." Id. at 1280-81. Finding a mandatory minimum sentence constitutionally excessive requires much more, though, than the mere utterance of the phrases above.
A sentencing judge must always start with the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional. See State v. Dorthey, supra at 1281 (Marcus, J., concurring); State v. Young, supra [94-1346 (La.App. 4 Cir. 10/26/95); 663 So.2d 525]. A court may only depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality.
A trial judge may not rely solely upon the non-violent nature of the instant crime or of past crimes as evidence which justifies rebutting the presumption of constitutionality. While the classification of a defendant's instant or prior offenses as non-violent should not be discounted, this factor has already been taken into account under the *1199 Habitual Offender Law for third and fourth offenders. LSA-R.S. 15:529.1 provides that persons adjudicated as third or fourth offenders may receive a longer sentence if their instant or prior offense is defined as a "crime of violence" under LSA-R.S. 14:2(13). Thus the Legislature, with its power to define crimes and punishments, has already made a distinction in sentences between those who commit crimes of violence and those who do not. Under the Habitual Offender Law those third and fourth offenders who have a history of violent crime get longer sentences, while those who do not are allowed lesser sentences. So while a defendant's record of nonviolent offenses may play a role in a sentencing judge's determination that a minimum sentence is too long, it cannot be the only reason, or even the major reason, for declaring such a sentence excessive.
Instead, to rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

Young, 94-1636 at pp. 5-6, 663 So.2d at 528 (Plotkin, J., concurring).
When determining whether the defendant has met his burden of proof by rebutting the presumption that the mandatory minimum sentence is constitutional, the trial judge must also keep in mind the goals of the Habitual Offender Law. Clearly, the major reasons the Legislature passed the Habitual Offender Law were to deter and punish recidivism. Under this statute the defendant with multiple felony convictions is treated as a recidivist who is to be punished for the instant crime in light of his continuing disregard for the laws of our state. He is subjected to a longer sentence because he continues to break the law. Given the Legislature's constitutional authority to enact statutes such as the Habitual Offender Law, it is not the role of the sentencing court to question the wisdom of the Legislature in requiring enhanced punishments for multiple offenders. Instead, the sentencing court is only allowed to determine whether the particular defendant before it has proven that the mandatory minimum sentence is so excessive in his case that it violates our constitution.
In the present case, we find that Defendant did not produce clear and convincing evidence that the mandate of La. R.S. 15:529.1 should not apply to him. Defendant's only offering was that the trial court consider that the instant offense was a crime of passion. Although the trial court cited Defendant's non-violent felony history, the record revealed that Defendant had a violent misdemeanor history with two convictions for simple battery and that the victim of the most recent offense sustained serious injuries. Defendant's many arrests suggest that he is not truly a "non-violent" person: the presentence investigation report indicated that Defendant had been arrested for simple battery of a police officer in 1987; possession of a firearm by a convicted felon in 1991; public intimidation in 1994; and drug possession and public intimidation in 1996. Defendant also has a history of threatening those in authority, and his probation or parole has been revoked six times. In the instant offense, Defendant did much worse than threaten the victim. He kicked open the door to her home and beat her with a board. When interviewed for the presentence investigation, the victim stated that she had fifty stitches on one side of her head and that Defendant subsequently threatened her and her daughter.
Johnson, 709 So.2d 672, clearly states that a non-violent history cannot be the major reason for a downward deviation. *1200 At the reconsideration hearing the trial court acknowledged Johnson, but then relied upon Defendant's non-violent history as the main reason for its downward deviation. The only other factor in the trial court's reasons was its view of policy considerations. However, as explained in Johnson, policy decisions regarding habitual offenders have already been made by the legislature. We, therefore, find merit in the State's assignments of error. Accordingly, Defendant's sentence is vacated, and the case is remanded for resentencing consistent with Johnson and with this opinion.

Errors Patent
In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. We have found one error patent.
The record reveals that the trial court did not advise Defendant of his right to remain silent and his right to a hearing before being adjudicated an habitual offender. However, we find this error harmless, as Defendant exercised his rights to remain silent and to a full evidentiary hearing. See State v. Carthan, 99-512 (La.App. 3 Cir. 12/8/99), 765 So.2d 357.

Decree
For the above reasons, Defendant's conviction is affirmed, but his sentence is vacated and the case is remanded for resentencing in compliance with State v. Johnson, 97-1906 (La.3/4/98); 709 So.2d 672.
CONVICTION AFFIRMED; SENTENCE VACATED; AND REMANDED.
NOTES
[1] The minutes of court reflect that Defendant was present with counsel at arraignment on May 5, 1997, at oral request for appointment of sanity commission on October 14, 1997, and when a joint motion for continuance was presented and granted in open court on February 19, 1997.